29 A.3d 475

Timothy A. FREY, et al.

v.

COMPTROLLER OF the TREASURY.

No. 62, Sept. Term, 2009.

Court of Appeals of Maryland.

Sept. 29, 2011.

114

118

Harry D. Shapiro (Seth J. Groman of Saul Ewing LLP, Baltimore, MD), on brief, for petitioners/cross-respondents.

John K. Barry, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BARBERA, J.

In this case we consider the State's authority to impose a certain tax known as the "Special Nonresident Tax" ("SNRT") upon nonresidents who neither live nor work in Maryland but have a source of income in the State. Petitioners David S. and Judith W. Antzis, Timothy A. and Mary S. Frey, and Rudolph Garcia and Randi E. Pastor–Garcia reside in Pennsylvania but pay Maryland State income taxes on the income earned by each husband as a partner in Saul Ewing, LLP ("the firm"), a multi-state law firm with offices in Maryland, Pennsylvania, Delaware, Washington, D.C., New York, and New Jersey. In 2005, the Comptroller of the Treasury issued a notice of assessment against Petitioners' 2004 joint Maryland nonresident income tax returns for failure to pay the SNRT.[1] The assessment included the amount owed for the SNRT, interest, and a penalty. Petitioners challenge, on federal and state constitutional grounds, the State's authority to impose the SNRT.

---

1. For ease of reference, we refer to Frey and the other nonresident taxpayers as "Petitioners" and the Comptroller of the Treasury as "Comptroller" even though they may also be designated, respectively, as "Cross–Respondents" and "Cross–Petitioner."

## I.

Maryland residents [2] and nonresidents alike are taxed under Maryland Code (1988, 2004 Repl.Vol.), § 10–105 of the Tax General Article ("T.G."),[3] which establishes the State income tax rates.[4] In addition, Maryland residents are subject to a

2. Maryland Code (1988, 2004 Repl.Vol.), § 10–101(k) of the Tax–General Article ("T.G.") provides, in relevant part:
 (1) Resident means:
 (i) an individual, other than a fiduciary, who:
 1. is domiciled in this State on the last day of the taxable year; or
 2. for more than 6 months of the taxable year, maintained a place of abode in this State, whether domiciled in this State or not;
 * * *
 (2) "Resident" includes, for the part of the taxable year that an individual resides in this State, an individual who:
 (i) moves to this State with the intent to be domiciled in this State; or
 (ii) is domiciled in this State and moves outside this State before the last day of the taxable year with the bona fide intention to remain permanently outside of this State.

3. Statutory references herein cite the versions in effect in 2004. We note that T.G. § 10–105, the provision prescribing the applicable State income tax rate, has been amended since 2004 and currently provides for a variable tax rate dependent solely on a resident's taxable income rather than a combination of the taxable income and the applicable taxable year. *See infra* note 4 (setting forth the text of T.G. § 10–105 as in effect in 2004).

4. T.G. § 10–105, entitled "State income tax rates," in relevant part, provides:
 (a) *Individual.*—The State income tax rate for an individual is:
 (1) 2% of Maryland taxable income of $1 through $1,000;
 (2) 3% of Maryland taxable income of $1,001 through $2,000;
 (3) 4% of Maryland taxable income of $2,001 through $3,000; and
 (4) for Maryland taxable income in excess of $3,000:
 (i) 4.875% for a taxable year beginning after December 31, 1997 but before January 1, 1999;
 (ii) 4.85% for a taxable year beginning after December 31, 1998 but before January 1, 2000;
 (iii) 4.85% for a taxable year beginning after December 31, 1999 but before January 1, 2001;
 (iv) 4.8% for a taxable year beginning after December 31, 2000 but before January 1, 2002; and
 (v) 4.75% for a taxable year beginning after December 31, 2001.
 * * *
 (c) *Married persons filing joint returns.*—For a husband and wife filing a joint income tax return, the rates specified in subsection (a) of

county tax, which is mandated by T.G. § 10–103 and § 10–106.[5] The rate of a resident's county tax is determined by

this section apply to the joint Maryland taxable income of the husband and wife.

**5.** T.G. § 10–103, entitled "County income tax," provides, in relevant part:

(a) *Required.*—Each county shall have a county income tax on the Maryland taxable income of:

(1) each resident, other than a fiduciary, who on the last day of the taxable year:

(i) is domiciled in the county; or

(ii) maintains a principal residence or a place of abode in the county;

\* \* \*

(4) except as provided in § 10–806(c) of this title, a nonresident who derives income from salary, wages, or other compensation for personal services for employment in the county.

(b) *Limitation.*—Except for the county income tax, a county, municipal corporation, special taxing district, or other political subdivision may not impose a general local income, earnings, or payroll tax, a general occupational license tax, or a general license or permit tax based on income, earnings, or gross receipts.

T.G. § 10–106, entitled "County income tax rate," provides:

(a) *In general; exception in Howard County.*—(1) Each county shall set, by ordinance or resolution, a county income tax equal to at least 1% but not more than the percentage of an individual's Maryland taxable income as follows:

(i) 3.05% for a taxable year beginning after December 31, 1998 but before January 1, 2001;

(ii) 3.10% for a taxable year beginning after December 31, 2000 but before January 1, 2002; and

(iii) 3.20% for a taxable year beginning after December 31, 2001.

(2) A county income tax rate continues until the county changes the rate by ordinance or resolution.

(3) (i) A county may not increase its county income tax rate above 2.6% until after the county has held a public hearing on the proposed act, ordinance, or resolution to increase the rate.

(ii) The county shall publish at least once each week for 2 successive weeks in a newspaper of general circulation in the county:

1. notice of the public hearing; and

2. a fair summary of the proposed act, ordinance, or resolution to increase the county income tax rate above 2.6%.

(4) Notwithstanding paragraph (1) or (2) of this subsection, in Howard County, the county income tax rate may be changed only by ordinance and not by resolution.

(b) *Rate change.*—If a county changes its county income tax rate, the county shall:

where the resident is domiciled on the last day of the taxable year. § 10–103(a)(1)(i). The only county income taxes permitted in the State are those prescribed in these sections of the Tax General Article, and the counties have no authority to impose income taxes other than those established by State statute. *See* T.G. § 10–103(b). Residents file a single tax return that reflects both county and State income taxes.

The Comptroller collects all taxes imposed under the Tax General Article, accounts for the revenue from those taxes, and distributes that revenue as directed in the Tax General Article. *See* T.G. § 2–109(a)(1)–(3). As to the State and county income taxes, the Comptroller collects them and, after distributing a portion of each income tax to various State funds designated by statute, *see* T.G. §§ 2–604 through 2–607, the Comptroller distributes the remaining *State* income tax revenue to the General Fund, T.G. § 2–609, and "distribute[s] to each county the remaining income tax revenue from individuals attributable to the county income tax for that county," T.G. § 2–608(a). In other words, the Comptroller ultimately directs State income tax revenue to the General Fund for State use and directs the local income tax revenue to the counties for their use.[6]

Of course, because nonresidents have no State county of residence, they are not required under T.G. § 10–106 to pay a local tax. Nonresidents are, however, subject to the SNRT. In 2004, the General Assembly enacted the SNRT, which applied retroactively to "all taxable years beginning after December 31, 2003." 2004 Md. Laws Ch. 430 § 30. The

---

(1) increase or decrease the rate in increments of one one-hundredth of a percentage point, effective on January 1 of the year that the county designates; and

(2) give the Comptroller notice of the rate change and the effective date of the rate change on or before July 1 prior to its effective date.

6. If the resident taxpayer lives in Baltimore City, that municipality receives the resident taxpayer's local taxes. For the purposes of this opinion, the terms "county" and "local" are synonymous with reference to income tax. *See Comptroller v. Blanton*, 390 Md. 528, 531 n. 1, 890 A.2d 279, 281 n. 1 (2006).

SNRT is codified at T.G. § 10–106. 1(a) and requires that "[a]n individual subject to the State income tax under § 10–105(a) of this subtitle, but not subject to the county income tax under § 10–106 of this subtitle, shall be subject to the tax imposed under this section."[7] T.G. § 10–106.1(a). The section further provides that "[t]he rate of the tax imposed ... shall be equal to the lowest county income tax rate set by any Maryland county in accordance with § 10–106 of this subtitle."[8] T.G. § 10–106.1(b). Although not obvious without reference to the cited statutory provisions, the SNRT imposes on nonresidents, in addition to the Maryland State income tax, an income tax equal to the lowest county tax rate available during the applicable tax year.

During the time period relevant to this case, § 10–106.1 required a nonresident who owed income taxes in Maryland to pay the State income tax of 4.75%, see T.G. § 10–105(a)(4)(v), and a tax equal to the lowest county tax rate imposed by any county in the State, which, at the time, was 1.25%. The SNRT, however, is not distributed to any particular county after it is collected by the Comptroller. Instead, T.G. § 2–609 provides that, "[a]fter making the distributions required under §§ 2–604 through 2–608.1 of this subtitle, the Comptroller shall distribute the remaining income tax revenue from individuals to the General Fund of the State." In other words, the Comptroller distributes to the taxpayers' county of residence

---

7. T.G. § 10–106 establishes the county income tax rates and the processes through which those rates may be changed.

8. T.G. § 10–106.1, entitled "Individuals subject to State tax but not county tax," provides in full:

 (a) *Tax imposed.*—An individual subject to the State income tax under § 10–105(a) of this subtitle, but not subject to the county income tax under § 10–106 of this subtitle, shall be subject to the tax imposed under this section.

 (b) *Rate.*—The rate of the tax imposed under this section shall be equal to the lowest county income tax rate set by any Maryland county in accordance with § 10–106 of this subtitle.

 (c) *Distribution.*—The tax imposed under this section shall be distributed by the Comptroller in accordance with § 2–609 of this article.

the remaining county tax revenue, and then deposits the remaining SNRT revenues into the State's General Fund.

### This Case

During 2004, Petitioners, though residents of Pennsylvania who worked outside of and owned no property in Maryland, paid State income taxes and local real estate and personal property taxes to the respective State subdivisions. At that time, Messrs. Antzis and Garcia conducted their legal practice in Pennsylvania, in Chesterbrook and Philadelphia, respectively, and Mr. Frey conducted his legal practice in Wilmington, Delaware. The firm is a partnership formed in Delaware, but, because it earns income in each of the states in which its offices are located, the firm apportions its income among these states when reporting its income. As a result, during the relevant time period, the firm reported taxable income and paid the applicable State income and other taxes in Maryland for each of the firm's partners, including Petitioners. *See* T.G. § 10–102.1 (imposing State income tax on partnerships with nonresident partners and requiring such partnerships to pay that tax on behalf of such partners). These taxes are not in dispute.

### The Litigation

As mentioned, Petitioners did not pay the additional SNRT imposed on their income attributed to the firm's operations in Maryland, and consequently, in 2005, the Comptroller issued notices of assessment to Petitioners for the unpaid SNRTs.[9] In response, and pursuant to T.G. § 13–508,[10] Petitioners

---

**9.** Mr. Antzis was assessed an additional $675.73 reflecting a SNRT of $579.96, interest of $37.77, and a penalty of $58.00. Likewise, Mr. Frey was assessed an additional $359.24 ($308.33 SNRT, $20.08 interest, $30.83 penalty), and Mr. Garcia was assessed an additional $1,873.22 ($1,607.77 SNRT, $104.72 interest, $160.77 penalty).

**10.** Pursuant to T.G. § 13–508, a taxpayer who receives an assessment for unpaid income tax may submit within 30 days "an application for revision of the assessment," § 13–508(a), in response to which the Comptroller must hold an informal hearing and issue to the taxpayer a final determination, § 13–508(c).

asked the Comptroller to revise the assessment, at an informal hearing held on September 19, 2005. On September 26, 2005, the Comptroller issued to each Petitioner a Notice of Final Determination affirming the assessment.

At the hearing, Petitioners presented the same constitutional challenges they raise in this appeal. The hearing officer summarized those arguments as follows:

[Petitioners argue that] the special nonresident tax violates the Interstate Commerce Clause and Due Process Clause of the United States Constitution, as well as the Maryland Constitution. The basis for this claim is that the [SNRT] places a tax burden on nonresidents that is not imposed on residents.... [SNRT] is distinguishable from the local tax imposed on Maryland residents because the tax revenue from the [SNRT] goes to the State of Maryland, while the tax revenue from the resident local tax goes to the Maryland counties.

The hearing officer determined as an initial matter that Petitioners' constitutional challenges to the SNRT exceeded the scope of the hearing. The officer then determined that, based on the information presented at the hearing, the assessment was consistent with T.G. § 10–106.1. The officer therefore affirmed the assessment.

### The Tax Court

On October 24, 2005, Petitioners individually appealed to the Maryland Tax Court.[11] On February 15, 2006, upon the Comptroller's motion, that court consolidated Petitioners' cases, and on May 10, 2006, heard the parties' arguments.

---

11. Petitioners' appeals to the Tax Court presented essentially the same questions as they present to this Court, namely: (1) whether the SNRT violates the Commerce Clause; (2) whether the SNRT violates the Equal Protection Clause; (3) whether the SNRT violates the Privileges and Immunities Clause; and (4) whether the SNRT violates the Maryland Constitution and Declaration of Rights. Petitioners also presented the issue of whether the penalties assessed against them by the Comptroller should be waived because of reasonable cause and whether the interest assessed against each of the Petitioners should be abated because of reasonable cause.

Neither party offered testimony, however, because they had agreed to a stipulation of the background and facts pertinent to the appeal. On June 22, 2006, the Tax Court affirmed the assessments on Petitioners but abated the penalties.

The court acknowledged at the outset Petitioners' argument that, because the SNRT imposes a nonresident tax that is applicable solely to nonresident income, not resident income, the provision is facially discriminatory and therefore violates the United States Constitution and the Maryland Constitution and Declaration of Rights. To support that contention, Petitioners cited *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), in which the Supreme Court emphasized that state laws that are facially discriminatory against interstate commerce are "virtually *per se* invalid." 516 U.S. at 331, 116 S.Ct. 848 (internal quotation marks omitted) (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). Although the court neither denied this characterization of *Fulton* nor that "§ 10–106.1 . . . appear[s] to discriminate against the out-of-state taxpayer," the court reasoned that an "appearance of discrimination . . . does not end the inquiry."

Under the Tax Court's interpretation of *Fulton*, when a tax is facially discriminatory and therefore presumed invalid, the government may overcome this presumption by showing that the statute is a " 'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce." 516 U.S. at 331, 116 S.Ct. 848 (internal quotation marks omitted) (quoting *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 647, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994)). To do so, however, the court pointed out that the government must satisfy a three-prong test applied in *Fulton*: (1) "identif[y] . . . the [intrastate tax] burden for which the State is attempting to compensate"; (2) show that "the tax on interstate commerce [is] roughly . . . approximate [to]-but [does] not exceed—the amount of the tax on intrastate commerce"; and (3) demonstrate that "the events on which the interstate and intrastate taxes are imposed [are] substantially equivalent," i.e., that they are "sufficiently similar in substance

to serve as mutually exclusive prox[ies] for each other." 516 U.S. at 332–33, 116 S.Ct. 848 (some internal quotation marks omitted) (some alterations in original) (quoting *Or. Waste Sys.*, 511 U.S. at 103, 114 S.Ct. 1345).

As to the first prong of the compensatory tax doctrine, the Tax Court determined that "the evidence is clear that the burden on intrastate commerce for which § 10–106.1, is compensating, is the burden of providing local governmental services, directly or indirectly, to all persons or entities physically situated or doing business within its local borders." By showing that the SNRT did not exceed the local tax burden upon Maryland residents, the Tax Court was satisfied that the Comptroller had demonstrated, under the second prong, that the tax on interstate commerce roughly approximates the tax on intrastate commerce. Specifically, the court noted that "§ 10–106.1 ensures that non-residents pay Maryland income taxes at the same rate or a lesser rate as Maryland residents." Finally, with regard to the third prong, the Tax Court found that "income is the event on which the tax is based for both residents and non-residents. Being the same event for both classes of taxpayer, it meets the test for 'substantially equivalent.'"

After concluding that analysis, the Tax Court turned to the remaining constitutional issues and ruled:

[Section] 10–106.1 serves a rational purpose to create parity in the income tax burdens between Maryland residents and non-residents. There is no extra tax burden that would deter a non-resident from free and open commerce inside or outside the state, and there is no extra tax burden that might be construed to violate the privileges and immunities, and equal protection accorded to everyone. Accordingly, § 10–106.1 does not violate the Interstate Commerce Clause ..., the Equal Protection Clause ..., the Privileges and Immunities Clause of the United States Constitution, or the Maryland Constitution and the Declaration of Rights.

Because, however, the Tax Court judged the appeal to be in good faith, the court abated the penalties assessed against

Petitioners. The Tax Court, however, denied Petitioners' request to abate the accrued interest, reasoning that the court lacked the authority to do so.

*Judicial Review*

On July 12, 2006, each of the Petitioners filed in the Circuit Court for Anne Arundel County a petition for judicial review of the Tax Court's decision. Upon Petitioners' motion, on December 5, 2006, the Circuit Court consolidated their cases. After hearing oral argument from the parties, on July 19, 2007, the court issued a memorandum opinion and order affirming, with respect to the constitutionality of the SNRT, the decision of the Tax Court.

Under the Circuit Court's analysis, the permissibility of the SNRT depended on whether it "is truly a county tax or a State tax imposed for the benefit of the counties." Unlike the Tax Court, the Circuit Court found that, because the State establishes the county taxes and the corresponding rates, the county tax is simply a variation of the State tax. The Circuit Court explained that, under this scheme, a taxpayer pays the State tax and either the local resident tax or the SNRT. The Circuit Court dismissed any contention that, because the Comptroller distributes the local income tax to the counties and the SNRT to the General Fund, and they are therefore distributed differently, the local resident tax and the SNRT are not State taxes. Accordingly, the Circuit Court found that the local tax and the SNRT are correlative components of the State income tax. Under this State tax scheme, the Circuit Court found that nonresidents bear a burden no more onerous than that of residents. The Circuit Court thus deemed the SNRT constitutional.

As to the Tax Court's determination that it could not abate the interest assessed against Petitioners, the Circuit Court disagreed. Citing T.G. § 13–606, which provides that, "[f]or reasonable cause, a tax collector may waive interest on unpaid tax," the Circuit Court inferred that the Tax Court had the authority to abate interest. Because the abatement of interest is discretionary, however, the Circuit Court declined to decide

the matter and remanded the case to the Tax Court to consider the issue.

On August 16, 2007, Petitioners timely noted an appeal to the Court of Special Appeals, seeking review of the same constitutional issues presented to the Circuit Court and a determination of whether the penalties and interest assessed against them should be waived for reasonable cause. On August 24, 2007, the Comptroller noted a cross-appeal, questioning whether the Tax Court "has discretionary authority to reduce or abate interest on the assessments against [Petitioners] when the interest is assessed by statute." As to the constitutional questions, the Court of Special Appeals held that the SNRT does not violate the United States Constitution or the Maryland Constitution and Declaration of Rights. *Frey v. Comptroller*, 184 Md.App. 315, 322, 965 A.2d 923, 927 (2009). The court further held that the Tax Court has the authority to consider and order the abatement of interest. *Id.*, 965 A.2d at 927.

The Court of Special Appeals began by considering whether the SNRT discriminates against interstate commerce, either on its face or in effect, and concluded that the tax was neither facially discriminatory nor discriminatory in effect. *See id.* at 343, 965 A.2d at 939 (stating that the court "need not look beyond the SNRT itself" to conclude that the tax is not discriminatory). In reaching its conclusion that the SNRT is not facially discriminatory, the Court of Special Appeals reasoned that, if the State tax, the county resident tax, and the SNRT are components of a single State tax scheme, the SNRT is not impermissibly discriminatory because the county taxes and the SNRT are both "paid to the State and the State distributes the revenue" and "they are both income taxes, that is, general forms of taxation that distribute the expenses of government." *Id.* at 352, 965 A.2d at 945. The court nevertheless concluded that, because the outcome was the same, "the Tax Court did not err in determining that the SNRT, on its face, was discriminatory, but that it was a valid compensatory tax." *Id.* at 343, 965 A.2d at 939.

After completing that analysis, however, the Court of Special Appeals acknowledged that it may affirm the Tax Court "only upon the grounds upon which it relied," [12] and thus the intermediate appellate court turned to the issue of whether the SNRT is a valid compensatory tax as defined by *Fulton. Id.* at 354, 965 A.2d at 946. To reach its conclusion that the SNRT is a valid compensatory tax, and thereby affirm the Tax Court's decision, the Court of Special Appeals relied on both *Fulton* and *Oregon Waste Systems,* which the Supreme Court cited heavily in *Fulton. Frey,* 184 Md.App. at 354–64, 965 A.2d at 946–52. In *Oregon Waste Systems,* the Court established the presumption that a facially discriminatory tax is per se invalid, 511 U.S. at 103 n. 9, 114 S.Ct. 1345, and the above-mentioned three factors a state must satisfy to overcome that presumption, *id.* at 103, 114 S.Ct. 1345. The Court of Special Appeals then applied those three factors to the SNRT to conclude that the SNRT is a valid compensatory tax. *Frey,* 184 Md.App. at 392, 965 A.2d at 968.

The Court of Special Appeals then addressed Petitioners' contention that, because there is "no rational justification for the State of Maryland to impose a tax on nonresidents with respect to income earned within the State that is greater than that imposed on residents," the SNRT violates the Equal Protection Clause. *Id.* at 393, 965 A.2d at 969. The court rejected this contention and agreed with the Tax Court, reasoning that the SNRT serves the "rational purpose of equalizing the income tax burdens between residents and nonresidents," serves "the legitimate purpose of helping to pay for government services from which [Petitioners] benefit," and "does not impose an additional tax burden on nonresidents because [they] do not pay a higher income tax to the State." *Id.* at 399, 965 A.2d at 972–73.

---

**12.** The Court of Special Appeals was correct to recognize that "[a]n administrative agency may be affirmed only on the basis of the grounds on which it decided the case." *Dep't of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 111 n. 1, 771 A.2d 1051, 1053 n. 1 (2001). We address this further *infra.*

The Court of Special Appeals similarly rejected Petitioners' contention that the SNRT violates the Privileges and Immunities Clause. That court noted that the Clause "is phrased in terms of state citizenship and was designed 'to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'" *Id.* at 401, 965 A.2d at 974 (internal quotation marks omitted) (quoting *United Bldg. & Constr. Trades Council v. Camden*, 465 U.S. 208, 215–216, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984)). The Court of Special Appeals concluded that, though "the SNRT is imposed only on nonresidents, residents also pay the county income tax," *id.* at 409, 965 A.2d at 974, and thus "the SNRT places nonresidents and residents on an equal footing because nonresidents pay no more Maryland income tax than residents," *id.* at 409, 965 A.2d at 978.

Likewise, the Court of Special Appeals held that the SNRT does not violate Article 24 of the Declaration of Rights and the Maryland Constitution.[13] *Id.* at 417, 965 A.2d at 983. The Court of Special Appeals acknowledged that, under *Frankel v. Board of Regents*, 361 Md. 298, 761 A.2d 324 (2000), "a governmental regulation placing a greater burden on some Marylanders than on others based on geographical factors must 'rest upon some ground of difference having a fair and substantial relation to the object of the' regulation." 184 Md.App. at 414–15, 965 A.2d at 981–82 (some internal quotation marks omitted). The court determined, though, that "the SNRT bears a fair and substantial relationship to the goal of

---

13. Article 24 of the Maryland Declaration of Rights provides:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Although Article 24 does not contain an express equal protection clause, the Court of Special Appeals correctly recognized that we have "held that the concept of equal protection is embodied within the Article." *Frey*, 184 Md.App. 315, 410, 965 A.2d 923, 979 (2009) (internal quotation marks omitted) (quoting *Neifert v. Dep't of Env't*, 395 Md. 486, 504, 910 A.2d 1100, 1111 (2006)).

requiring out-of-state residents to pay for governmental services" and therefore held that the SNRT does not violate the Maryland Declaration of Rights. *Id.* at 415, 965 A.2d at 982.

Finally, the Court of Special Appeals considered whether the Tax Court has the authority to modify or abate interest assessed by the Comptroller. 184 Md.App. at 417, 965 A.2d at 983. The court reasoned that, because the Tax Court may consider appeals concerning the "application for an abatement, reduction, or revision of any assessment," *id.* at 421, 965 A.2d at 985 (quoting T.G. § 3–103(a)(4)), and "reassess, or reclassify, abate, modify, change or alter any valuation, assessment, classification, tax or final order appealed," *id.* at 421, 965 A.2d at 985 (quoting T.G. § 13–528(a)), parties may appeal to the Tax Court the Comptroller's assessment of interest, *id.* at 421–22, 965 A.2d at 985–86. Given that parties may appeal the assessment of interest to the Tax Court, the Court of Special Appeals held that a plain reading of the relevant statutory provisions compels the conclusion that the Tax Court may consider and order the abatement of interest. *Id.*, 965 A.2d at 985–86. The Court of Special Appeals therefore remanded the case to the Tax Court to consider the issue of abatement. *Id.* at 423, 965 A.2d at 986.

On April 9, 2009, Petitioners filed with this Court a petition for writ of certiorari, and on May 8, 2009, the Comptroller filed a cross-petition for writ of certiorari. We granted both petitions. *Frey v. Comptroller*, 409 Md. 46, 972 A.2d 861 (2009). Petitioners present for our consideration the following four issues:

1. Whether the Court of Special Appeals erred in determining that although the Special Non–Resident Tax was discriminatory on its face, it was nonetheless a valid compensatory tax under the Interstate Commerce Clause of the U.S. Constitution.

2. Whether the Court of Special Appeals erred in determining that the Special Non–Resident Tax does not violate the Equal Protection Clause of the U.S. Constitution.

3. Whether the Court of Special Appeals erred in determining that the Special Non–Resident Tax does not violate the Privileges and Immunities Clause of the U.S. Constitution.

4. Whether the Court of Special Appeals erred in determining that the Special Non–Resident Tax does not violate the Maryland Constitution and the Declaration of Rights.

Additionally, we consider the single question presented by the Comptroller:

Did the Maryland Tax Court correctly determine that it lacks the authority to reduce the interest payable on an assessment of tax when the Legislature granted that power only to Tax Collectors identified in the statute and historically, the Tax Court has never been part of the tax collection process?

For reasons we shall explain, we hold that the SNRT does not violate the United States Constitution or the Maryland Constitution and Declaration of Rights and, moreover, that the Tax Court has the authority to consider and order the abatement of interest assessed against parties appealing to that court. We, therefore, affirm the judgment of the Court of Special Appeals.

## II.

 The Tax Court is "an adjudicatory administrative agency in the executive branch of state government." *Furnitureland S., Inc. v. Comptroller,* 364 Md. 126, 137 n. 8, 771 A.2d 1061, 1068 n. 8 (2001). As such, the Tax Court is subject to the same standards of judicial review as other administrative agencies. T.G. § 13–532(a)(1) ("A final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10–222 and 10–223 of the State Government Article."); *Supervisor of Assessments v. Hartge Yacht Yard, Inc.,* 379 Md. 452, 461, 842 A.2d 732, 737 (2004). Moreover, because we are reviewing the decision of an administrative agency, our review looks "through the circuit court's and intermediate appellate court's decisions . . . and evaluates the

decision of the agency." *People's Counsel for Baltimore County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007). As mentioned, we may not uphold the final decision of an administrative agency on grounds other than the findings and reasons set forth by the agency. *Evans v. Burruss*, 401 Md. 586, 593, 933 A.2d 872, 876 (2007); *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123, 771 A.2d 1051, 1060 (2001) ("[A]n appellate court will review an adjudicatory agency decision solely on the grounds relied upon by the agency.").

 Although we retain the power to review administrative decisions, judicial review of these decisions is narrow. We shall not "substitute [our] judgment for the expertise of those persons who constitute the administrative agency." *People's Counsel for Baltimore County v. Loyola College in Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008) (internal quotation marks omitted) (quoting *United Parcel Serv., Inc. v. People's Counsel for Baltimore County*, 336 Md. 569, 576–77, 650 A.2d 226, 230 (1994)). Accordingly, we review the Tax Court's factual findings and the inferences drawn therefrom under a substantial evidence standard. *Surina*, 400 Md. at 681, 929 A.2d at 910; *Md. Aviation Admin. v. Noland*, 386 Md. 556, 571, 873 A.2d 1145, 1154 (2005) ("A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record." (quoting *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–69, 729 A.2d 376, 380–81 (1999))). Under this standard, we consider "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters*, 248 Md. 292, 309, 236 A.2d 282, 292 (1967); *see also Surina*, 400 Md. at 681, 929 A.2d at 910 (explaining that under the substantial evidence standard courts examine whether the administrative record contains "such evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks omitted) (quoting *Mayor and Aldermen of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979)).

 Just as we defer to an agency's factual findings, we afford great weight to the agency's legal conclusions when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose. *Surina*, 400 Md. at 682, 929 A.2d at 911; *Noland*, 386 Md. at 572, 873 A.2d at 1154. This deference, however, "extends only to the application of the statutes or regulations that the agency administers." *Loyola College*, 406 Md. at 67, 956 A.2d at 174. When an agency's decision is necessarily premised upon the "application and analysis of caselaw," that decision rests upon "a purely legal issue uniquely within the ken of a reviewing court." *Id.* at 67–68, 956 A.2d at 174.

 In this case, the Tax Court's decision required the application and analysis of cases interpreting the United States Constitution as well as the Maryland Constitution and Declaration of Rights. Under these circumstances, we evaluate an agency's legal conclusions to determine whether they are based upon an error of law, without deference to the agency's determination. *Id.* at 68, 956 A.2d at 174; *Surina*, 400 Md. at 683, 929 A.2d at 911; *Adventist Health Care, Inc. v. Md. Health Care Comm'n*, 392 Md. 103, 120, 896 A.2d 320, 331 (2006).

Before addressing the various issues presented in the parties' petitions for certiorari, we consider the import of the structure of the State's income tax scheme and whether the Court of Special Appeals correctly concluded that the county income tax imposed under T.G. § 10–106 is a State tax. Although this issue did not control the Tax Court's decision, we deem it prudent to address the Court of Special Appeals's analysis on this point. It is especially so because Petitioners argue that the judgment of the Court of Special Appeals affirming the Tax Court is erroneous because that judgment is "entirely dependent on its [incorrect] determination that the county income tax and State income tax are one and the same." To support this assertion, Petitioners cite *Comptroller v. Blanton*, contending that this Court held that the State and

local taxes are "two distinct taxes." 390 Md. 528, 533, 543, 890 A.2d 279, 282, 288 (2006). Comptroller, naturally, disagrees with Petitioners' characterization of that case and contends that, because the State mandates the county income tax, restricts the authority of the counties to set the rate, and distributes the funds collected pursuant to the tax, the county income tax is part of a single State-imposed income tax scheme.

The General Assembly adopted Maryland's county income tax in 1967 when the legislature overhauled the State's entire income tax law. *Stern v. Comptroller*, 271 Md. 310, 311–12, 316 A.2d 240, 240–41 (1974) (citing 1967 Md. Laws, ch. 142, § 6). In addition to implementing the county tax, this restructuring adopted the federal adjusted gross income amount as the base for Maryland's individual and corporate income tax. *Id.* at 312, 316 A.2d at 241. Yet, the General Assembly did not amend the applicable "scheme of exemptions, exclusions, and deductions" as radically. *See id.*, 316 A.2d at 241. As a result, residents claimed credits for income taxes paid to another state against State and county income taxes, as they had prior to the revisions. *See id.* at 312–13, 316 A.2d at 241. After the Comptroller denied the credits against the county income tax on the ground that the credits were only available to offset the State income tax, the aggrieved parties sought review of that decision. *Id.*, 316 A.2d at 241. Ultimately, this Court was faced with determining whether the statutory provision authorizing the credit against "the amount of income tax payable ... under this subtitle" applied to both the State and county income taxes. *Id.* at 311, 316 A.2d at 240.

We held in *Stern* that the credit applied to all taxes, including the county income tax, appearing in the State "Income Tax" subtitle. *Id.* at 313–14, 316 A.2d at 241–42. In reaching this conclusion, we rejected the argument that the local political subdivisions, rather than the State, imposed the county tax thus precluding the application of the credit in question. *Id.*, 316 A.2d at 241–42. We did so, in part, because the county income taxes were adopted, mandated, and collected by the State. *Id.*, 316 A.2d at 241–42. In other words,

because the county income tax was prescribed in the "Income Tax" subtitle and was administered by the State, that tax was just as susceptible to the credit as other State-imposed income taxes.

In *Blanton,* however, we again considered whether Maryland residents who owed State and county income taxes could claim a credit for income taxes paid in another state against both their State and county income taxes. After our opinion in *Stern,* the General Assembly added T.G. § 10–703(a), which provides that a taxpayer may "claim a credit only against the State income tax." Additionally, the General Assembly expressly defined State income tax as "State tax on income imposed under this title" and county income tax as "county tax on income authorized in § 10–103 of this subtitle." *Blanton,* 390 Md. at 535 n. 8, 890 A.2d at 283 n. 8 (quoting T.G. § 10–101(d) & (n)). We recognized as an initial matter that permitting Maryland residents to deduct credits from county income taxes in the amount of income taxes paid to other states "would have the possible absurd result of [certain taxpayers] paying little or no local tax for the services provided by the county while a neighbor with similar income, exemptions, and deductions might be paying a substantial local tax to support those services." *Id.* at 536 n. 9, 890 A.2d at 284 n. 9 (internal quotation marks omitted) (quoting *Coerper v. Comptroller,* 265 Md. 3, 8, 288 A.2d 187, 189 (1972)). We then analyzed T.G. § 10–703(a) under the traditional rules of statutory construction. *Id.* at 537–38, 890 A.2d 279, 890 A.2d at 284–85.

First, we reasoned that the General Assembly did not intend to permit taxpayers to apply, against the county tax, credit for out-of-state taxes paid, because § T.G. 10–703(a) expressly limited the applicability to "*only* . . . State income tax,*" thus, cancelling "out all other possibilities." *Id.* at 539, 890 A.2d at 286 (emphasis added). We reasoned further that the statutory provision allocating the available tax credits undermined any assertion that the credit at issue applied to the county tax because, when a credit was applicable to both the State and county income taxes, the statute so provided. *Id.* at 539–40, 890 A.2d at 286. As additional support for the

credit's limited applicability, we noted that, after our decision in *Stern*, the legislature had amended the income tax statutes to prohibit specifically the application of the out-of-state tax credit to county income tax. *Id.* at 541–42, 890 A.2d at 287–88. We also looked to the Revisor's Notes related to § 10–703(a), which explained the legislature's intent that the word "only" indicate that taxpayers were precluded from applying, against the county tax, credit for out-of-state income taxes paid. *Id.* at 543, 890 A.2d at 288. Accordingly, we concluded that the State and county income taxes were treated separately under the Maryland income tax scheme and "the [l]egislature did not intend the term 'only against the State income tax' to include local income tax for purposes of credits under § 10–703(a)." *Id.* at 543, 890 A.2d at 288.

Petitioners' contention that the State and county income taxes are not part of a single State-imposed income tax scheme rests on the assumption that *Blanton* overruled our holding in *Stern* that the county income tax is a part of a State-administered income tax scheme. We do not interpret *Blanton* to have such an effect. Both *Stern* and *Blanton* were concerned primarily with the applicability of the out-of-state tax credit to the county tax, and in both cases, we resolved the issue by resorting to the rules of statutory construction. After our holding in *Stern*, the General Assembly amended the income tax provisions to provide explicitly that the out-of-state tax credit does not apply to county taxes. Our holding in *Blanton* was entirely contingent on the revision of the applicable statutory language and was silent as to the significance of the scheme through which the State and county taxes were administered.

We may not infer from this silence the *Blanton* Court's intent to overrule the portion of *Stern* in which we concluded that the county tax was not administered by the local political subdivisions. Accordingly, we conclude that our determination in *Stern* that the county income tax is part of a State-administered income tax scheme was neither overruled nor undermined by this Court's holding in *Blanton*. Further-

more, for these same reasons, we affirm the Court of Special Appeals's conclusion that the county tax levied under T.G. § 10–103 and § 10–106 is a State tax. As the Tax Court correctly noted, however, whether the county tax is imposed by the local political subdivisions or the State is not determinative of the constitutional issues presented to this Court.

## III.

The Commerce Clause of the United States Constitution provides Congress with the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys.*, 511 U.S. at 98, 114 S.Ct. 1345. The negative commerce clause, often referred to as the "dormant" Commerce Clause, operates as an "implied limitation on the power of state and local governments to enact laws affecting foreign or interstate commerce." *Bd. of Trs. v. City of Baltimore*, 317 Md. 72, 131, 562 A.2d 720, 749 (1989). This limit on the authority of state and local governments applies "even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261, (1995).

"The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue v. Davis*, 553 U.S. 328, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008) (internal quotation marks omitted) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)). This interpretive approach represents an effort to "effectuate[ ] the Framers' purpose to 'preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the

Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.'" *Fulton,* 516 U.S. at 330–31, 116 S.Ct. 848 (quoting *Jefferson Lines,* 514 U.S. at 180, 115 S.Ct. 1331).[14]

 Despite these concerns, the dormant Commerce Clause does not entirely prohibit the states from regulating aspects of interstate commerce. In the context of the taxing power of the several states, the Supreme Court has interpreted the dormant Commerce Clause to permit states to tax interstate commerce so long as "the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the tax." *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 285, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). In other words, "interstate commerce may be made to 'pay its way.'" *Or. Waste Sys.,* 511 U.S. at

---

**14.** Although the parties have operated thus far under the assumption that the SNRT is susceptible to the Commerce Clause, we deem it necessary to give explicit consideration to the issue. The Supreme Court has recognized that the dormant Commerce Clause applies even when no traditional "goods" or "articles" burden the stream of commerce. *See, e.g., Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 332, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977) (holding that a New York securities transfer tax that placed greater liability on out-of-state sales than it did on instate sales violated the Commerce Clause). Moreover, even when a state imposes a tax on an intrastate activity, such as earning income, if that tax substantially affects interstate commerce, the tax is subject to scrutiny under the Commerce Clause. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 615, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) ("The Court has . . . long since rejected any suggestion that a state tax or regulation affecting interstate commerce is immune from Commerce Clause scrutiny because it attaches only to a 'local' or intrastate activity.").

In this case, the SNRT applies to taxpayers residing in Pennsylvania and doing business in Maryland. As such, the tax applies to income produced via the means of, and destined to flow through, interstate commerce. Furthermore, the SNRT applies solely to nonresidents earning income in Maryland. The SNRT may thereby substantially affect interstate commerce and is consequently susceptible to Commerce Clause scrutiny. *Cf. Commonwealth Edison,* 453 U.S. at 617–19, 101 S.Ct. 2946 (analyzing under the Commerce Clause a Montana severance tax applicable solely within Montana to coal mined in that state but likely to be sold to out-of-state entities).

102, 114 S.Ct. 1345 (quoting *Complete Auto*, 430 U.S. at 281, 97 S.Ct. 1076). "It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden[s]." *Id.* (internal quotation marks omitted) (quoting *W. Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58 S.Ct. 546, 82 L.Ed. 823 (1938)). Accordingly, the dormant Commerce Clause has been interpreted to permit the states to impose taxes on "that aspect of interstate commerce to which the [s]tate[s] b[ear] a special relation, and that the [s]tate[s] bestow[ ] powers, privileges, and benefits sufficient to support a tax." *Complete Auto*, 430 U.S. at 286, 97 S.Ct. 1076

 Likewise, the dormant Commerce Clause does not prohibit states from taxing in-state income earned by out-of-state individuals. *See Shaffer v. Carter*, 252 U.S. 37, 52–53, 40 S.Ct. 221, 64 L.Ed. 445 (1920). The authority to impose such taxes rests in the proposition that

> [s]tates have general dominion, and, saving as restricted by particular provisions of the Federal Constitution, complete dominion over all persons, property, and business transactions within their borders; they assume and perform the duty of preserving and protecting all such persons, property, and business, and, in consequence, have the power normally pertaining to governments to resort to all reasonable forms of taxation in order to defray the governmental expenses.

*Id.* at 50, 40 S.Ct. 221. From these principles the Supreme Court has drawn the conclusion that, just as states may tax residents, states may "levy a duty *of like character, and not more onerous in its effect,* upon incomes accruing to non-residents from their property or business within the State, or their occupations carried on therein." *Id.* at 52, 40 S.Ct. 221 (emphasis added).

 Regardless of the states' authority to tax income earned by nonresidents incidental to in-state transactions, facially discriminatory state taxes raise a presumption of per se invalidity. Such laws are subject to the strictest scrutiny,

and the "burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.'" *Or. Waste Sys.*, 511 U.S. at 101, 114 S.Ct. 1345 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). States may overcome this presumption of invalidity, however, by establishing that the facially discriminatory tax "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* at 101, 114 S.Ct. 1345 (internal quotation mark omitted) (quoting *Limbach*, 486 U.S. at 278, 108 S.Ct. 1803).

 To determine whether the law in question satisfies this standard, the Supreme Court has adopted the compensatory tax doctrine, under which a facially discriminatory tax survives strict scrutiny if it is the "rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce." [15] *Id.* at 103, 114 S.Ct. 1345. In other words, under the doctrine, a facially discriminatory state law will survive judicial review so long as the law was "designed simply to make interstate commerce bear a burden already borne by intrastate commerce." *Fulton*, 516 U.S. at 331, 116 S.Ct. 848 (internal quotation mark omitted) (quoting *Lohman*, 511 U.S. at 647, 114 S.Ct. 1815). To repeat, the compensatory tax doctrine consists of three prongs, which to satisfy the state must: (1) "identif[y] . . . the [intrastate tax] burden for which the State is attempting to compensate"; (2) show that the tax on interstate commerce "roughly . . . approximate[s]—but [does] not exceed—the amount of the tax on intrastate commerce"; and (3) demonstrate that "the events on which the interstate and intrastate taxes are imposed [are] substantially equivalent," i.e., that they are "sufficiently similar in substance to serve as mutually exclusive prox[ies] for each other." *Fulton*, 516 U.S. at 332–33, 116 S.Ct. 848 (some internal quotation marks omitted) (some alterations in original) (quoting *Or. Waste Sys.*, 511 U.S. at 103, 114 S.Ct. 1345).

---

**15.** This doctrine is also referred to as the complementary tax doctrine. *Or. Waste Sys. v. Dep't of Env't Quality*, 511 U.S. 93, 102, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

■ Because the constitutional flaws of a facially discriminatory tax appear in the language of the statute, analyzing that statute in isolation would reveal little about the compensatory character of the tax. Accordingly, courts applying the compensatory tax doctrine consider the effect of the facially discriminatory tax as related to the state's general tax scheme. *See Or. Waste Sys.*, 511 U.S. at 103, 114 S.Ct. 1345 (referring to the validity of a facially discriminatory tax as part of a "compensatory tax *scheme* " (emphasis added)); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 402, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (O'Connor, J., concurring) ("[T]he critical consideration is the overall effect of the statute on both local and interstate activity." (internal quotation mark omitted) (quoting *Brown–Forman Distillers, Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986))). A "truly compensatory tax scheme" is such that "the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed." *Or. Waste Sys.*, 511 U.S. at 103, 114 S.Ct. 1345 (internal quotation marks omitted) (quoting *Henneford v. Silas Mason Co.*, 300 U.S. 577, 584, 57 S.Ct. 524, 81 L.Ed. 814 (1937)). Moreover, "[t]here is no demand in ... [the] Constitution that the State shall put its requirements in any one statute ... [i]t may distribute them as it sees fit, if the result, taken in its totality, is within the State's constitutional power." *Fulton*, 516 U.S. at 332, 116 S.Ct. 848 (internal quotation marks omitted) (some alterations in original) (quoting *Henneford*, 300 U.S. at 584, 57 S.Ct. 524).

Petitioners argue not only that the SNRT is facially discriminatory but also that the SNRT fails the first prong of the compensatory tax doctrine because the Comptroller has failed to identify the intrastate burden for which the tax compensates. Petitioners contend that, because the proceeds of the SNRT flow to the General Fund rather than to the localities, we cannot know what costs the SNRT revenues cover and thus the Tax Court incorrectly found that the SNRT compen-

sates for "the burden of providing local governmental services, directly or indirectly, to all persons or entities physically situated or doing business within its local borders." Petitioners further argue that the SNRT does not constitute a compensatory tax because it is a general tax used to provide local services, and the Supreme Court has stated that "permitting discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation 'would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds.' " *Or. Waste Sys.*, 511 U.S. at 105 n. 8, 114 S.Ct. 1345 (quoting *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1284 (7th Cir.1992)). Moreover, Petitioners suggest that, even though they do not pay county taxes, they pay their fair share of the cost of providing local governmental services because the firm pays real estate and personal property taxes.

In response, the Comptroller argues that the SNRT is not facially discriminatory, and, even if it is, the tax is a valid compensatory tax because the SNRT does not tax interstate transactions more heavily than intrastate transactions. As to the first prong of the compensatory tax doctrine, the Comptroller contends that the SNRT serves a legitimate state interest by equalizing the total income tax burden of State residents, comprised of the State and county income taxes, with the income tax burden of nonresidents. The Comptroller asserts that Petitioners wrongly focus on the distinct distribution methods of the SNRT and county income tax revenues rather than the amount paid. Instead, the Comptroller contends that *Fulton* requires us to consider whether the total burden on residents and nonresidents is equivalent. Moreover, the Comptroller argues that "appropriations from the State's general fund also . . . benefit local governments, [and] . . . nonresidents benefit from these appropriations," and therefore "it is reasonable to require nonresidents to pay the same combined tax as residents."

Before addressing the application of the compensatory tax doctrine to the SNRT, we pause to address the Comptroller's contention that the SNRT is not facially discriminatory. The Comptroller argues that the SNRT is not facially discriminatory because under the tax a "nonresident is not taxed more heavily" than a resident. The Comptroller, however, is conflating facial discrimination with discriminatory effect. In *Oregon Waste Systems*, the Supreme Court considered a law that imposed a surcharge upon "solid waste generated out-of-state" but did not apply to solid waste generated in-state. 511 U.S. at 96, 114 S.Ct. 1345 (quotation marks omitted). Moreover the surcharge was three times the fee that applied to the disposal of instate waste. *Id.* at 99–100, 114 S.Ct. 1345. Despite this express classification based on geographic origin and the disparity between the in-state and out-of-state charges, the Oregon Supreme Court held that the surcharge was not facially discriminatory because the law's purpose was to compensate the state for "actual costs incurred [by state and local government]." *Id.* at 97, 114 S.Ct. 1345 (internal quotation mark omitted). The Supreme Court disagreed. *Id.* The Court described the Oregon court's focus on the statute's "compensatory aim" as contrary to precedent and clarified that "the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." *Id.* at 100, 114 S.Ct. 1345.

The surcharge applied in *Oregon Waste Systems* was three times greater than the charge imposed on in-state waste and thus the law's discriminatory character was more obvious than in this case, in which the SNRT rate is equal to the "lowest county income tax rate set by any Maryland county." T.G. § 10–101(b). Yet, the SNRT undeniably singles out nonresidents and imposes upon them a State income tax not applicable to residents and, thereby, discriminates against nonresidents "on the basis of some interstate element." *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 332 n. 12, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). Even though the Comptroller points out that the SNRT rate is not more than the lowest county income tax rate, we cannot ignore that, on its face, the

SNRT applies solely to nonresidents and thus appears on its face to subject their income to a higher State income tax than that of residents. *Cf. Lohman*, 511 U.S. at 646–47, 114 S.Ct. 1815 (treating as facially discriminatory a Missouri use tax that exempted goods subject to the state's sales tax even though the tax was purportedly part of a scheme intended to equalize the tax burdens imposed on purchasers of in-state and out-of-state goods).

Moreover, we hesitate to accept the Comptroller's assertion that SNRT is not facially discriminatory on the ground the SNRT rate will never be more than a resident's county income tax rate because to do so requires the concession that the two taxes are interchangeable. Making such an assumption seems tantamount to concluding that the SNRT and the county tax are "sufficiently similar in substance to serve as mutually exclusive 'prox[ies]' for each other," which is part of the analysis required under the compensatory tax doctrine. *Fulton*, 516 U.S. at 333, 116 S.Ct. 848 (internal quotation mark omitted) (alteration in original) (quoting *Or. Waste Sys.*, 511 U.S. at 103, 114 S.Ct. 1345). If states were able to escape the doctrine's scrutiny at this stage by satisfying this single test, even though a statute appeared to be discriminatory on its face, the compensatory tax doctrine's utility would be limited. Accordingly, we decline the Comptroller's invitation to adopt such a practice in this case and conclude that the SNRT is a facially discriminatory tax.[16] Whether SNRT violates the Commerce Clause, however, depends on whether the tax merely imposes on interstate commerce a burden already borne by intrastate commerce, and in other words, is a compensatory tax.

The first prong of the compensatory tax doctrine requires the state to "identify the intrastate tax for which it seeks to compensate." *Fulton*, 516 U.S. at 334, 116 S.Ct. 848. The corollary to this requirement is that the "intrastate tax must

---

16. Our conclusion on this point comports with that of the Tax Court. The Court of Special Appeals, in dicta, came to the opposite conclusion, with which, for the reasons we have stated, we disagree.

serve some purpose for which the State may otherwise impose a burden on interstate commerce." *Id.* In other words, the state must "identify some in-state activity or benefit in order to justify the compensatory levy." *Id.*

■ As discussed, it is well-settled that a state possesses the authority to impose taxes on income generated within the state. *Shaffer,* 252 U.S. at 50, 40 S.Ct. 221. The validity of a state income tax is not compromised merely because that tax applies to residents and nonresidents. As long as the burden the state imposes on nonresidents is not more onerous in effect than that imposed on residents, such a tax remains a legitimate exercise of state power. *Id.* at 52, 40 S.Ct. 221. The states retain this authority, in part, because income taxes are an effective "method of distributing the burdens of government, favored because ... contributions [are collected] from those who realize current pecuniary benefits under the protection of the government, and because the tax may be readily proportioned to their ability to pay." *Id.* at 51, 40 S.Ct. 221.

■ Consequently, we need not belabor the issue of whether it is within the State's authority to impose a tax on the income of nonresidents earned in Maryland. As recognized by the Tax Court, any taxpayer, resident or not, earning income in Maryland has availed herself of State services as well as the "services being provided by a Maryland county or by Baltimore City. Such local services traditionally include police and fire protection, waste disposal, water and sewer services, and the myriad of other local governmental activities on behalf of people within each local jurisdiction." Further, during the proceedings in that court, "[i]t was conceded that such local benefits do, in fact, accrue both directly and indirectly to nonresidents while they are present or doing business in a jurisdiction." Thus, the SNRT survives the first prong of the compensatory tax doctrine insofar as it imposes a tax on income earned in Maryland to compensate for services provided to the nonresidents earning that income.

■ Having established the basis upon which the State may impose the SNRT, we turn to whether the Comptroller

has identified a legitimate intrastate tax burden for which the SNRT compensates. The intrastate burden for which the putative compensatory tax serves as a counterpart must be specific and reasonably related to the costs the state seeks to offset with the compensatory tax. *See Fulton,* 516 U.S. at 335–36, 116 S.Ct. 848 (holding that a discriminatory tax on out-of-state corporate stock was not compensatory in relation to general in-state taxation); *Or. Waste Sys.,* 511 U.S. at 104–05, 114 S.Ct. 1345 (holding that a discriminatory tax on out-of-state waste disposal was not compensatory in relation to general in-state taxation); *Henneford,* 300 U.S. at 584, 57 S.Ct. 524 (permitting the imposition of a use tax on out-of-state products to complement sales taxes of the same amount on in-state products because both related to the use of property within the state and operated to balance the burden between intrastate and interstate commerce). The most common example of an intrastate burden for which a state may impose a complementary tax is a sales tax. *Lohman,* 511 U.S. at 648, 114 S.Ct. 1815. Indeed, the Supreme Court has acknowledged that "[a] use tax is generally perceived as a necessary complement to [a] sales tax." *Id.* (internal quotation marks omitted) (alteration in original) (quoting *Williams v. Vermont,* 472 U.S. 14, 24, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985)). Use taxes are deemed complementary to sales taxes because they serve to ensure that all "tangible property used or consumed in the State [is] subject to a uniform tax burden irrespective of whether it is acquired within the State . . . or from without the State." *Halliburton Oil Well Cementing Co. v. Reily,* 373 U.S. 64, 66, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963).

Suggesting that intrastate commerce bears a general burden, not otherwise shared by interstate commerce, is insufficient. *See Fulton,* 516 U.S. at 335, 116 S.Ct. at 856 (rejecting state's contention that a facially discriminatory tax compensated for an intrastate burden funded through general taxation); *Or. Waste Sys.,* 511 U.S. at 104, 114 S.Ct. 1345. For example, in *Oregon Waste Systems,* the Supreme Court rejected Oregon's argument that a surcharge imposed solely upon waste generated out-of-state compensated for the intrastate funds

allocated to the cost of in-state waste disposal. *Id.* In reaching that conclusion, the Court noted that the only comparable fee the state applied to the disposal of waste generated in state was approximately one-third of the amount imposed on out-of-state waste and therefore the surcharge was not complementary. *Id.* Additionally, the Court disagreed with the state's contention that the surcharge was complementary to the portion of the costs of in-state waste disposal funded through general taxation. *Id.* The Court reasoned that to determine whether, and to what extent, funds raised through general taxation funded the disposal costs was too difficult. *Id.*

In *Fulton,* the Court also recognized the risk of permitting states to treat "general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine." 516 U.S. at 335, 116 S.Ct. 848. *Fulton* addressed whether a North Carolina "intangibles tax" violated the Commerce Clause. *Id.* at 327, 116 S.Ct. 848. The intangibles tax applied to the fair market value of corporate stock owned by residents or otherwise having a taxable situs in the state. *Id.* at 327–28, 116 S.Ct. 848. The tax was offset, however, by a deduction equal to the amount of the corporation's income subject to taxation in North Carolina and therefore applied only to corporations that earned income not taxable in North Carolina. *Id.* at 328, 116 S.Ct. 848. To justify applying the tax to corporations organized outside North Carolina, the state argued that the tax compensated for the privilege of accessing North Carolina's capital markets. *Id.* at 334–35, 116 S.Ct. 848. The state then argued that the corresponding intrastate tax burden through which the state supported its capital markets was the state's general corporate income tax. *Id.* at 335, 116 S.Ct. 848. The *Fulton* Court rejected the argument that a general revenue measure was a relevant intrastate burden under the compensatory tax doctrine because whether intrastate commerce paid through general taxation its share of costs related to maintaining the state's capital markets was too difficult to determine because the revenues raised through general taxation were not traceable to that particular expense.

*Id.* The Court further rejected the state's contention that the intangibles tax compensated for the cost of access to North Carolina's capital markets borne by the intrastate market because the state's blue sky laws regulated access to its capital markets and imposed a fee for that privilege. *Id.* at 336, 116 S.Ct. 848.

Here, the Comptroller submits that the intrastate burden for which the SNRT seeks to compensate is "to equalize the total income tax paid by State residents—the combined State and local components of the State income tax." More specifically, the Comptroller argues that nonresidents earning income in Maryland benefit from local governmental services but do not pay their fair share of the cost because these services are funded by the county tax, which applies solely to residents.[17] The SNRT is a valid means through which to achieve this goal. Although the Supreme Court has expressed skepticism regarding whether general forms of taxation may serve as relevant intrastate burdens, *Fulton,* 516 U.S. at 335, 116 S.Ct. 848, the limited application of the county income tax and the specific purpose it serves distinguish the county tax from the more general forms of taxation rejected as relevant

---

**17.** The county tax also applies to select nonresidents who earn income in Maryland and reside in out-of-state jurisdictions that impose local taxes on Maryland residents earning income in those out-of-state jurisdictions. *See* T.G. § 10–806(c) (imposing on nonresidents with Maryland taxable income a county tax unless the nonresident resides in a local jurisdiction that "imposes no tax on the income of a Maryland resident derived from wages for employment in that locality," exempts the income of Maryland residents derived from employment in that locality from the locality's income tax, or "allows a credit for that income and exempts that income from the withholding requirements for its tax on income.") These select nonresidents are subject to a county tax in Maryland calculated according to the rate that applies in the Maryland jurisdiction in which they are employed.

For the purposes of this opinion, however, we shall refer to the county income tax as if it is only applicable to residents because the SNRT applies only to nonresidents who do not pay the county tax, T.G. § 10–106.1, and the parties have framed the issues related to the SNRT's constitutionality as dependent on whether the State has impermissibly distinguished between residents and nonresidents, not nonresidents and other nonresidents. Thus, the applicability of the county income tax to certain nonresidents is immaterial to our analysis.

intrastate burdens. Rather, the coupling of the SNRT and the county income tax as offsetting taxes is more akin to the constitutional adoption of a use tax to offset a sales tax.

In *Lohman,* the Supreme Court rejected Missouri's contention that its uniform use tax upon all goods purchased out-of-state and "stored, used, or consumed within the State," 511 U.S. at 643, 114 S.Ct. 1815, was intended to compensate for local sales taxes because the local tax rates varied by jurisdiction and whether the use tax exceeded the applicable local sales tax was a matter of chance, *id.* at 648–49, 114 S.Ct. 1815. The SNRT, however, will always be equal to the lowest county tax in effect, and thus will never exceed the relevant intrastate burden for which it compensates.

For these same reasons, the complementary tax scheme at issue in this case is distinguishable from the schemes involving the unconstitutional surcharge in *Oregon Waste Systems* and the intangibles tax in *Fulton.* Unlike the discriminatory surcharge in *Oregon Waste Systems,* which was three times the amount of the most similar charge applied to the disposal of in-state waste, the SNRT is equivalent to the lowest county tax rate. This similarity bolsters the Comptroller's argument that the SNRT is meant to compensate for the intrastate burden funded through the county tax system.

The county income tax is materially distinguishable from those intrastate burdens identified in *Oregon Waste Systems* and *Fulton.* The tax at issue here serves a specific purpose, funding local services, and the amount of funds allocated to this purpose are quantifiable. *Cf. Fulton,* 516 U.S. at 334–35, 116 S.Ct. 848 (holding that funds raised through general taxation were not a relevant intrastate burden to which the state's discriminatory intangibles tax served as a complement); *Or. Waste Sys.,* 511 U.S. at 104, 114 S.Ct. 1345 (criticizing the state's argument that the surcharge compensated for costs funded through general taxation because whether those taxes funded waste disposal, and, if so, to what extent, was too difficult to determine). Moreover, the relationship between

the county tax revenues and the local services they fund is much less tenuous than in either of those cases.

Despite the relative simplicity of the scheme through which the State collects funds for local services, i.e., the county tax scheme, Petitioners argue that the SNRT does not compensate for a relevant intrastate burden because they pay their fair share for local services in real estate and personal property taxes. *Cf. Fulton,* 516 U.S. at 336, 116 S.Ct. 848 (rejecting North Carolina's argument that its intangibles tax funded its capital markets because the state charged fees for accessing those markets under its blue sky laws). Petitioners ignore, however, that residents also pay real estate and personal property taxes and, therefore, the payment of real estate and personal property taxes does not compensate for the intrastate burden borne exclusively by residents, i.e., the county tax.

We also reject Petitioners' contention that the county tax is not a relevant intrastate burden because the county tax revenues, in contrast to the revenues raised by the SNRT, are eventually allocated among the various counties to spend at their discretion. This distinction is not determinative. The common thread of equality running through the cases upholding taxes under the compensatory tax doctrine does not require that the tax identified as the relevant intrastate burden be identical to the compensatory tax, but rather that the in-state and out-of-state interests be treated equally. *See Maryland v. Louisiana,* 451 U.S. 725, 759, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) (describing the compensatory tax doctrine as requiring "equality of treatment between local and interstate commerce"). In this sense, the county tax serves a relevant intrastate burden for which the State may impose a compensatory burden on interstate commerce because, even though the taxes are executed differently, the *effect* of the compensatory tax scheme is to equalize the burden among residents and nonresidents. *See id.* at 759–60, 101 S.Ct. 2114 (reasoning that a Louisiana use tax was not a valid compensatory tax because the tax was part of a statutory scheme under which residents were ultimately taxed less heavily). Indeed,

the majority of nonresidents subject to the SNRT are treated more favorably than their Maryland resident counterparts because the SNRT imposes the lowest county tax rate.

We have noted that "[t]here is no demand in ... [the] Constitution that the State shall put its requirements in any one statute. It may distribute them as it sees fit, if the result, taken in its totality, is within the State's constitutional power." *Henneford*, 300 U.S. at 584, 57 S.Ct. 524 (internal quotation marks omitted) (first alteration not in original) (quoting *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 480, 52 S.Ct. 631, 76 L.Ed. 1232 (1932)). In the context of the compensatory tax doctrine, interpreting this principle to permit states to enact separate taxes as necessary to fund government services but to require those statutes to be equivalent in substance and effect would unnecessarily restrict the states' regulatory power and undermine the purpose of the compensatory tax doctrine. *See id.* at 585–88, 57 S.Ct. 524 (explaining that the purpose of the compensatory tax doctrine is to ensure that states do not impose heavier burdens on interstate commerce but permits imposing taxes that operate differently). As the Supreme Court has noted, "[d]iscrimination, like interstate commerce itself, is a practical conception. We must deal in this matter, as in others, with substantial distinctions and real injuries." *Gregg*, 286 U.S. at 481, 52 S.Ct. 631. Thus we will not discount the intrastate burden for which the State seeks to compensate merely because the revenues generated are allocated differently. We agree with the Tax Court's finding that "the General Fund of Maryland exists to provide funding for the benefit of all Maryland counties and Baltimore City, selectively, through legislation and through the legislative budgeting process." Through this process, the State may allocate funds to compensate those counties in need of assistance. Accordingly, we agree with the Court of Special Appeals, and the Tax Court, that the county income tax is the intrastate burden for which the State seeks to compensate through the SNRT.

We turn now to the second prong of the compensatory tax doctrine: whether the State has shown that the tax on interstate commerce roughly approximates the amount of the tax on interstate commerce. *Or. Waste Sys.*, 511 U.S. at 103, 114 S.Ct. 1345. Petitioners argue that the SNRT does not approximate the amount of the tax on intrastate commerce because the SNRT does not fund the same expenses as does the county income tax. The Comptroller responds that the proper focus of the compensatory tax doctrine's second prong is on whether the amounts paid are substantially equivalent, not on how those taxes are allocated. Thus, the Comptroller contends that, because the SNRT rate is necessarily equal to the lowest county income tax rate, the two amounts are roughly equivalent and the doctrine's second prong is satisfied.

In arguing that a compensatory tax is not a rough approximate of the tax on intrastate commerce if it does not fund the same expenses, Petitioners cite *Oregon Waste Systems*, in which the Supreme Court rejected Oregon's argument that its discriminatory surcharge roughly approximated the intrastate costs funded through the general taxation. *Id.* at 104, 114 S.Ct. 1345. In reaching that conclusion, the Court reasoned that determining whether the relevant intrastate and interstate burdens were roughly equivalent was too difficult because the funds generated through general taxation were "lost in general revenues" and the portion allocated to waste disposal could not be quantified. *Id.* Likewise, Petitioners point to *Fulton*, in which the Court noted that "[p]ermitting discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds." *Fulton*, 516 U.S. at 335, 116 S.Ct. 848 (internal quotation marks omitted) (quoting *Or. Waste Sys.*, 511 U.S. at 105 n. 8, 114 S.Ct. 1345).

Petitioners' reliance on these principles, however, is unfounded. The relationship between the county income tax and providing funds for local services is much less tenuous than

the relationship between the putative corresponding intrastate burden identified in either *Oregon Waste Systems* or *Fulton.* In *Oregon Waste Systems,* the state attempted to justify imposing a surcharge on out-of-state waste disposal by arguing that intrastate commerce paid its fair share through general taxation. In *Fulton,* the state attempted to justify its discriminatory intangibles tax on out-of-state corporations, by arguing that intrastate commerce paid its fair share through corporate income taxation. Both arguments were unsuccessful. In *Fulton,* the Court explained the pitfalls of accepting North Carolina's argument that its intangibles tax compensated for corporate income tax revenues allocated to funding the state's capital markets:

> The corporate income tax is a general form of taxation, not assessed according to the taxpayer's use of particular services, and before its revenues are earmarked for particular purposes they have been commingled with funds from other sources. As a result, the Secretary cannot tell us what proportion of the corporate income tax goes to support the capital market, or whether that proportion represents a burden greater than the one imposed on interstate commerce by the intangibles tax.

516 U.S. at 338, 116 S.Ct. 848.

Here, the Comptroller argues that the SNRT compensates for costs funded through a specific tax, the county income tax. Unlike the State income tax or other taxes allocated to the General Fund and "lost in general revenues," the county income tax revenues are apportioned to the counties in accordance with the applicable county rate and the total amount paid by county residents. As such, the amount of the county income tax that funds local services is more easily quantifiable than the proportion of general income tax revenues dedicated to funding waste disposal in *Oregon Waste Systems* or of the corporate income tax revenues that supported North Carolina's capital markets in *Fulton.* The SNRT is further distinguished from the impermissible discriminatory taxes in those cases because the rate of the SNRT is tied directly to the lowest county tax rate and thus guarantees that the

proportion of the burden imposed on intrastate commerce "represents a burden greater than the one imposed on interstate commerce." *Id.* Moreover, unlike more general forms of taxation, the county tax revenues are earmarked for a particular purpose. Because the local municipalities retain the authority to set the county tax rates in accordance with local budgetary needs and the discretion to expend locally the revenues collected, we may reasonably infer that the county income tax revenues are collected to serve a specific purpose-funding local governmental services.

▉ Furthermore, precedent dictates that the practical effect, not the form, of the compensatory tax scheme controls. *See, e.g., Lohman,* 511 U.S. at 647–49, 114 S.Ct. 1815 (concluding that a state-imposed use tax intended to compensate for locally imposed sales taxes was discriminatory only in the jurisdictions in which the corresponding local sales tax was less than the use tax). The cases upholding use taxes under the compensatory tax doctrine emphasize that the doctrine requires "equality of treatment between local and interstate commerce." *Maryland v. Louisiana,* 451 U.S. at 759, 101 S.Ct. 2114. In the context of the dormant Commerce Clause, such "equality of treatment" is necessary to ensure that states do not enact laws favoring local economic interests to the detriment of interstate interests. That objective is not furthered by striking down a law such as the SNRT on the ground that it is not roughly equivalent to the burden on intrastate commerce, even though the SNRT imposes a tax no greater than the county income tax. *See Alaska v. Arctic Maid,* 366 U.S. 199, 205, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961) ("No 'iron rule of equality' between taxes laid by a State on different types of business is necessary."). The SNRT rate is exactly equivalent to the lowest county income tax rate effective during the relevant tax year, and, consequently, we conclude that the SNRT satisfies the second prong of the compensatory tax doctrine.

Turning to the third prong of the doctrine, we consider whether the State has shown that "the events on which the

interstate and intrastate taxes are imposed [are] substantially equivalent." *Fulton,* 516 U.S. at 333, 116 S.Ct. 848 (internal quotation marks omitted) (quoting *Or. Waste,* 511 U.S. at 103, 114 S.Ct. 1345). Petitioners contend, of course, that the SNRT and the county income tax are not sufficiently similar because the SNRT revenues are distributed to the General Fund and the county tax revenues are apportioned to the counties. Petitioners further argue that the equality of treatment required under this third prong dictates that taxes fall on the same class of taxpayers, which is a condition that cannot be met, because the SNRT is imposed solely on nonresidents. The Comptroller counters that the taxable events are sufficiently equivalent because both taxes are triggered by earning income in Maryland.

As under the second prong, our focus remains not on whether the triggering events are identical, but on whether they are "sufficiently similar in substance" to serve as proxies for each other. *Id.* (quoting *Or. Waste Sys.,* 511 U.S. at 103, 114 S.Ct. 1345). For example, when considering whether correlative taxes fall upon "substantially equivalent events" for the purposes of the compensatory tax doctrine, the Supreme Court has held that sales and use taxes are sufficiently similar because, even though the taxes are difference in substance, they both tax, essentially, the use and enjoyment of personal property and operate to balance the respective burdens on intrastate and interstate commerce, thereby, putting the parties affected on equal footing. *See Henneford,* 300 U.S. at 581–84, 57 S.Ct. 524. Likewise, the SNRT and the county income tax are imposed on the *same* event, earning income in Maryland, and operate to ensure that any individual earning income in Maryland is subject to the same income tax burden.

As to Petitioners' contention that administrative differences between a putative compensatory tax and its counterpart preclude the determination that they are substantially equivalent, we find no support for that interpretation of the doctrine. The Supreme Court has refused to treat as taxes on substantially equivalent events: a Louisiana tax on the first-use of natural gas transported into Louisiana and a sales tax on

natural gas produced in state, *Armco, Inc. v. Hardesty,* 467 U.S. 638, 642–43, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984) (describing *Maryland v. Louisiana,* 451 U.S. at 758–59, 101 S.Ct. 2114); a West Virginia tax on products sold at wholesale in the state but produced out of state that did not apply to products manufactured in the state and an in-state manufacturing tax, *id.* at 642, 104 S.Ct. 2620; an Alabama tax that applied to a percent of a foreign firm's capital employed in the state and a tax on 1% of the par value of the stock of domestic firms because the former taxed the foreign corporation's decision to do business in the state and the later taxed the domestic firm's ownership of property within the state, *S. Cent. Bell Tel. Co. v. Alabama,* 526 U.S. 160, 170, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999); as already discussed, an Oregon tax on disposal of out-of-state waste and a tax on earning income, *Or. Waste Sys.,* 511 U.S. at 105, 114 S.Ct. 1345; and an intangibles tax on corporations doing business outside North Carolina and a tax on resident shareholders because the taxes imposed burdens on different classes of taxpayers, *Fulton,* 516 U.S. at 340–43, 116 S.Ct. 848.

Administrative differences, meaning methods of collection and distribution, however, were not the determinative factor in those cases. Just as in the sales/use tax cases, the Court focused, rather, on whether the taxes were quantitatively equal and whether they functioned to enable intrastate and interstate commerce to compete on a level playing field by taxing similarly situated taxpayers. *Id.* at 340–41, 116 S.Ct. 848 (emphasizing that a true compensatory tax regime permits a court to make "a finding of combined neutrality on interstate competition" and that the incidence of the taxes at issue must fall upon taxpayers within the same class). We therefore decline to impose an additional requirement of administrative equivalence in this case.

Contrary to Petitioners' assertions, taxes that fall upon differently described taxpayers do not necessarily fall upon dissimilarly situated taxpayers. This contention is undermined by the numerous sales/use tax regimes that have been upheld under the compensatory tax doctrine. The statutes

enacting use taxes necessarily describe the events and persons upon which the tax falls differently from the events and persons upon which sales taxes are imposed. Use taxes are imposed on persons who purchase goods out-of-state where those goods were not subject to a sales tax, and sales taxes are imposed on persons who purchase goods in-state. The circumstances giving rise to the need for such a compensatory tax scheme require that the statutes describe differently the persons subject to each tax. Were the two taxes imposed on identical taxpayers, the imbalance between intrastate and interstate commerce would not be corrected. *See Henneford,* 300 U.S. at 581–84, 57 S.Ct. 524.

Likewise, the SNRT and the county income tax necessarily describe differently the taxpayers subject to each levy. The SNRT falls upon taxpayers subject to the State income tax but not the county income tax, which effectively imposes a tax on anyone who earns taxable income in Maryland but who is not a resident of a Maryland county. *See* T.G. § 10–102 ("[A] tax is imposed on the Maryland taxable income of each individual. . . ."). The county income tax is imposed "on the Maryland taxable income" of taxpayers domiciled in a Maryland county or Baltimore City. T.G. § 10–103(a); *see* T.G. § 1–101(f) (defining "county" as "a county of the State and, unless expressly provided otherwise, Baltimore City"). The taxable events prescribed under both levies are the same—earning taxable income in Maryland. The taxpayers are necessarily described differently, however, to equalize the burden imposed on the taxable income of taxpayers who reside in a Maryland county or Baltimore City. By imposing a tax on those taxpayers who earn taxable income in Maryland but escape the county income tax, the SNRT ensures that all individuals competing in Maryland's marketplace compete on equal footing. The compensatory tax doctrine is intended to permit exactly this. We therefore conclude that the SNRT and the county income tax fall upon substantially equivalent events.

Accordingly, we hold that the SNRT satisfies the compensatory tax doctrine and, consequently, does not violate

the dormant Commerce Clause. Our inquiry, however, is far from complete. We must now consider whether the SNRT violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

## IV.

■■■■ The Equal Protection Clause provides that "no State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Yet, in the context of "internal taxation schemes[,] 'the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.'" *Williams v. Vermont*, 472 U.S. 14, 22, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, [Supreme Court] decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *see also Lehnhausen*, 410 U.S. at 359, 93 S.Ct. 1001 ("The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. The test is whether the difference in treatment is an invidious discrimination."). In other words, "[i]f the classification is not purely arbitrary and has a rational basis, the statute does not violate the Equal Protection Clause." *Governor of Md. v. Exxon Corp.*, 279 Md. 410, 439, 370 A.2d 1102, 1118 (1977) (citing *McGowan v. Maryland*, 366 U.S. 420, 425–428, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). Moreover, "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Lehnhausen*, 410 U.S. at 364, 93 S.Ct. 1001 (internal quotation marks omitted) (quoting *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S.Ct. 406, 84 L.Ed. 590 (1940)).

Petitioners argue that the SNRT violates the Equal Protection Clause because the tax does not equalize the income tax burdens borne by residents and nonresidents, but rather subjects nonresidents to a State income tax rate 25% higher than that applicable to residents, and thus the discriminatory tax has no rational basis. The Comptroller, not surprisingly, disagrees and argues that, because the total amount of income tax paid by nonresidents does not exceed the total amount of income tax paid by residents, the SNRT does not violate the Equal Protection Clause.

Even assuming *arguendo* that the SNRT imposes a higher State income tax on nonresidents than is imposed on residents, an argument with which we have dispensed, Petitioners fail to overcome the presumption of constitutionality that bolsters state tax legislation. *See id.* ("There is a presumption of constitutionality which can be overcome 'only by the most explicit demonstration that a classification is hostile and oppressive discrimination against particular persons and classes.' " (quoting *Madden,* 309 U.S. at 88, 60 S.Ct. 406)). The Equal Protection Clause "imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation." *Id.* at 359, 93 S.Ct. 1001 (quoting *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 526, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959)). States, when adopting tax regimes, are "not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value." *Bowers,* 358 U.S. at 527, 79 S.Ct. 437. Instead, our analysis considers whether the distinction present in the law is supported by any rational basis, and we are not to assume that a law was enacted for reasons other than those that are rational. *Lehnhausen,* 410 U.S. at 364–65, 93 S.Ct. 1001 ("[C]ourts cannot assume that [the Legislature's] action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action." (quoting *Carmichael v. S. Coal & Coke Co.,* 301 U.S. 495, 510, 57 S.Ct. 868, 81 L.Ed. 1245 (1937))). "The fact that a statute discriminates in favor of a

certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction. . . ." *State Bd. of Tax Comm'rs v. Jackson*, 283 U.S. 527, 537, 51 S.Ct. 540, 75 L.Ed. 1248 (1931).

The Tax Court ruled that the SNRT does not violate the Equal Protection Clause because the distinction made by the tax is supported by a rational basis. The court reasoned that non-residents earning income in Maryland benefit from local services and "[i]t seems perfectly reasonable . . . for the State to seek compensation for these services from nonresidents through the tax system." Specifically, the Tax Court determined that "§ 10–106.1 serves a rational purpose to create parity in the income tax burdens between Maryland residents and non-residents." That court further explained that the discrimination was not impermissible because "[t]here is no extra tax burden that would deter a non-resident from free and open commerce inside or outside the state, and there is no extra tax burden that might be construed to violate . . . equal protection accorded to everyone." In other words, the Tax Court determined, not only that the SNRT serves a rational purpose, but also that the tax's distinction between nonresidents and residents has a rational basis. We agree.

We infer from the foregoing analysis of the Tax Court that it correctly reasoned that the SNRT reasonably distinguishes between residents and nonresidents because residents are subject to a county income tax to fund the local services from which they benefit and nonresidents are subject to no such tax. Moreover, the SNRT's distinction between residents and nonresidents is not made solely by reason of the state in which the nonresident taxpayer is domiciled, but rather is made because the system through which the State funds local services imposes taxes according to a person's domicile. *See Bowers*, 358 U.S. at 528–30, 79 S.Ct. 437 (explaining that a tax that differentiates between taxpayers based on place of residence does not violate the Equal Protection Clause so long as other circumstances justify distinguishing between two classifications of taxpayers).

Moreover, even if nonresident taxpayers contribute more in taxes to the General Fund, the total amount contributed by nonresidents and residents to funding the costs of providing State and local governmental services is the same. *See St. Louis Sw. Ry. Co. v. Arkansas*, 235 U.S. 350, 362, 35 S.Ct. 99, 59 L.Ed. 265 (1914) ("[W]hen the question is whether a tax imposed by a State deprives a party of rights secured by the Federal Constitution[,] . . . [w]e must regard the substance, rather than the form, and the controlling test is to be found in the operation and effect of the law as applied and enforced by the State."). Thus, nonresidents and residents who earn taxable income in Maryland are treated equally even though the laws distinguish between them. *See Caskey Baking Co. v. Virginia*, 313 U.S. 117, 61 S.Ct. 881, 85 L.Ed. 1223 (1941) ("Classification is not discrimination. It is enough that those in the same class are treated with equality.").

To bolster their contention that the classification made in the SNRT is not supported by any rational basis, Petitioners direct us to *Williams*, the only case in which the Supreme Court struck down a state tax on the basis of an Equal Protection Clause violation. In that case, Vermont imposed a use tax on cars purchased outside the state but registered in Vermont. 472 U.S. at 15, 105 S.Ct. 2465. Residents who had purchased a car in Vermont, however, were exempt from the use tax if they had paid a Vermont sales tax. *Id.* Residents were also exempt from the use tax if they had paid an out-of-state sales tax that exceeded amount of the Vermont use tax. *Id.* The same credit, however, did not apply to registrants who purchased a car outside of Vermont before becoming residents of that state. *Id.* at 15–16, 105 S.Ct. 2465. The Court concluded that the use tax violated the Equal Protection Clause because the tax served "no legitimate purpose" furthered by the discriminatory exemption and "residence at the time of purchase [was] a wholly arbitrary basis on which to distinguish among present Vermont registrants." *Id.* at 23, 105 S.Ct. 2465. The Court reasoned that "[t]he purposes of the statute would be identically served, and with an identical burden," if the tax applied to all residents who had purchased

a car out of state and registered that car in Vermont, regardless of whether the car had been used outside the state before it was registered there. *Id.* at 24, 105 S.Ct. 2465.

Petitioners' reliance on *Williams* ignores that the decision was based on the Court's conclusion that "appellants have not been 'accorded equal treatment, and the inequality is not because of the slightest difference in [Vermont's] relation to the decisive transaction, but solely because of the[ir] different residence' " at the time of the transaction. *Id.* at 24, 105 S.Ct. 2465 (quoting *Wheeling Steel Corp. v. Glander,* 337 U.S. 562, 572, 69 S.Ct. 1291, 93 L.Ed. 1544 (1949)). In other words, Vermont denied an exemption to new residents registering a car there because they had purchased the car out of state before they became Vermont residents, regardless of whether they had paid a corresponding sales tax, and the state could not rationally explain the distinction.

■■■ Here, however, nonresidents are taxed, not because they are nonresidents earning income in Maryland, but because the tax scheme through which the State funds local services imposes taxes according to the county in which the taxpayer is domiciled and nonresidents will otherwise fall outside the scope of that scheme. Moreover, unlike the Vermont residents who were exempt from the use tax if they had paid an out-of-state sales tax of equal value, Maryland residents do not escape liability because they are subject to the county income tax of at least an equal rate. Prohibiting the State from collecting revenues to fund the local services that benefit both nonresidents and residents only because the State has employed this two-tiered tax scheme would result in a windfall to nonresidents. Furthermore, such a prohibition likely would require the State to adopt a new tax scheme, which, given the effectiveness of the current system, would be nothing more than a wasteful substitute. As we have already explained, the Equal Protection Clause does not mandate that the State create a perfect tax scheme, merely a reasonable one. For this and the other reasons discussed, we hold that the SNRT does not violate the Equal Protection Clause.

## V.

The Privileges and Immunities Clause of Article IV of the United States Constitution provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The purpose of this provision is to "plac[e] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 296, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) (quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869)). To that end, "it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Toomer v. Witsell*, 334 U.S. 385, 396, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). Doing business on terms of substantial equality includes the right not to be subjected, "in property or person[,] to taxes more onerous than the citizens of the latter State are subjected to." *Lunding*, 522 U.S. at 296, 118 S.Ct. 766 (internal quotation mark omitted) (quoting *Shaffer*, 252 U.S. at 56, 40 S.Ct. 221); *see also Travis v. Yale & Towne Mfg. Co.*, 252 U.S. 60, 78, 40 S.Ct. 228, 64 L.Ed. 460 (1920) (explaining that the Privileges and Immunities Clause "plainly and unmistakably secures and protects the right of a citizen of one State . . . to be exempt from any higher taxes or excises than are imposed by the State upon its own citizens" (internal quotation mark omitted) (quoting *Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 430, 20 L.Ed. 449 (1870))).

Petitioners argue that, "[i]f the constitutionality of the SNRT is upheld, nothing will prevent other states from enacting similar provisions, imposing additional taxes on Maryland residents, that will shift income tax revenues away from Maryland in the form of credits for taxes paid to those other states." Petitioners suggest that such an outcome is inconsistent with the Privileges and Immunities Clause and, therefore, the SNRT must fail. Petitioners further contend that the tax should fail because, as they have argued throughout, the

SNRT imposes a higher State income tax on nonresidents than is imposed on residents. The Comptroller responds that Maryland's tax scheme, which necessitates and implements the SNRT, is "wholly different" from any tax scheme that the Supreme Court has held to be in violation of the Privileges and Immunities Clause because, under Maryland's income tax scheme, nonresidents pay no more than residents. The Comptroller further argues that the State's tax scheme is permissible because it treats residents and nonresidents equally without relying on credits or deductions available in the nonresident's home state to create this balance.

 Before addressing Petitioners' fear that permitting Maryland to impose the SNRT on nonresidents will instigate a "tax war" among the states, we dispense with their argument that the SNRT impermissibly taxes nonresidents at a higher rate than residents. We have indicated that the Privileges and Immunities Clause does not prohibit the states from taxing nonresidents, but rather permits the states to impose taxes on nonresidents as long as those taxes are "not more onerous in effect than those imposed under like circumstances upon citizens of the . . . State." *Lunding,* 522 U.S. at 297, 118 S.Ct. 766 (internal quotation mark omitted) (quoting *Shaffer,* 252 U.S. at 53, 40 S.Ct. 221). Yet, even under the Privileges and Immunities Clause, state legislatures retain, "in taxation, even more than in other fields, . . . the greatest freedom in classification." *Austin v. New Hampshire,* 420 U.S. 656, 661, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975) (internal quotation marks omitted) (quoting *Madden,* 309 U.S. at 88, 60 S.Ct. 406).

 Despite this pragmatic approach to the Privileges and Immunities Clause, the states do not have carte blanche to adopt taxes that, based solely on geographical distinctions, distinguish between resident and nonresident taxpayers. In such cases, the standard of review is "substantially more rigorous than that applied to state tax distinctions among . . . forms of business organizations or different trades and professions." *Id.* at 663, 95 S.Ct. 1191. To justify a tax that distinguishes between residents and nonresidents, a state

must demonstrate that "(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Lunding*, 522 U.S. at 298, 118 S.Ct. 766 (internal quotation marks omitted) (quoting *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 284, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985)).

 Generally, the Supreme Court has interpreted this test to require the state to demonstrate that, despite the discriminatory tendency of the tax at issue, the tax results in "substantial equality of treatment for the citizens of the taxing State and nonresident taxpayers." *Austin*, 420 U.S. at 665, 95 S.Ct. 1191; *see also Travellers' Ins. Co. v. Connecticut*, 185 U.S. 364, 372, 22 S.Ct. 673, 46 L.Ed. 949 (1902) ("The object should be to place the burden so that it will bear as nearly as possible equally upon all."). To determine whether the law in question effectuates the requisite equal treatment, we do not examine merely the form of the law in question but instead, just as under the Equal Protection Clause, we consider whether the practical operation and effect of the challenged tax imposes on nonresidents a burden more onerous than that imposed on residents. *Lunding*, 522 U.S. at 297, 118 S.Ct. 766 ("[W]here the question is whether a state taxing law contravenes rights secured by [the Federal Constitution], the decision must depend not upon any mere question of form, construction, or definition, but upon the practical operation and effect of the tax imposed." (internal quotation marks omitted) (first alteration not in original) (quoting *Shaffer*, 252 U.S. at 55, 40 S.Ct. 221)); *see also Shaffer*, 252 U.S. at 56, 40 S.Ct. 221 (rejecting, as "paying too much regard to theoretical distinctions and too little to the practical effect and operation of the respective taxes as levied," a challenge to an Oklahoma tax on nonresident property and business within the state because residents paid a sufficiently equivalent income tax).

The Comptroller proffers that the SNRT permissibly distinguishes between residents and nonresidents because the tax is offset by the county income taxes imposed on State residents.

The Tax Court gave credence to the Comptroller's justification, finding that the SNRT operates to "equalize the income tax burden between residents and non-residents, and that non-residents will not pay more than residents who are also subject to a county tax." We agree that the discriminatory treatment evident on the face of the statute reaches no farther than the statute's text. We have explained throughout this opinion that the SNRT's effect on nonresidents is no more onerous than the comparable county income taxes paid by residents. The total tax on the Maryland taxable income of nonresidents is no higher than the total tax on the Maryland taxable income of residents.

With regard to whether the distinction between residents and nonresidents "bears a substantial relationship to the State's objective," which is to equalize the tax burden on nonresidents and residents, we again agree with the Tax Court. That court determined that the State may seek compensation for the local governmental services enjoyed by nonresidents and, to capture those revenues under Maryland's current tax scheme, the State required a separate tax not tied to the county in which those services were provided.

Admittedly, the taxes operate differently and are apportioned to different governmental entities, State and local. Nevertheless, those distinctions do not constitute substantially unequal or arbitrary treatment. The Supreme Court has recognized that some insubstantial disparities in treatment are permissible under the Privileges and Immunities Clause because "[a]bsolute equality in taxation can never be obtained." *Travelers' Ins.*, 185 U.S. at 371, 22 S.Ct. 673 (internal quotation marks omitted) (quoting *Tappan v. Merchs. Nat'l Bank of Chicago*, 86 U.S. (19 Wall) 490, 504, 22 L.Ed. 189 (1874)). The test is whether the distinctions are reasonable and related to the State's relationship to the in-state activity subject to the tax. *See Lunding*, 522 U.S. at 314–15, 118 S.Ct. 766 (holding that a New York tax scheme granting credits for residents' alimony payments but denying nonresidents the same credit violated the Privileges and Immunities Clause because the distinction was unrelated to the state's connection to the

expense and unjustified by any state policy); *Austin*, 420 U.S. at 665–66, 95 S.Ct. 1191 (holding that a New Hampshire income tax that effectively applied only to nonresidents violated the Privileges and Immunities Clause because the tax categorically denied nonresidents an exemption from the tax without imposing a similar or offsetting tax on residents); *Mullaney v. Anderson*, 342 U.S. 415, 416–19, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (holding that an Alaska fishing license scheme violated the Privileges and Immunities Clause because the scheme imposed a $5 fee on residents and a $50 fee on nonresidents and the state failed to show that the "differential in fees [bore] any relation to this difference in cost" of enforcing the license law against residents and nonresidents); *Toomer*, 334 U.S. at 398–99, 68 S.Ct. 1156 (holding that South Carolina statutes effectively prohibiting nonresidents from fishing in South Carolina waters violated the Privileges and Immunities Clause because the state offered insufficient evidence of a "reasonable relationship between the danger represented by non-citizens, as a class, and the severe discrimination practiced upon them"); *Shaffer*, 252 U.S. at 53–59, 40 S.Ct. 221 (holding that an Oklahoma tax scheme denying to nonresidents business-related deductions related to out-of-state costs did not violate the Privileges and Immunities Clause, even though residents could deduct instate and out-of-state losses, because the disparate treatment was reasonably related to the state's relationship to the taxed activity in that nonresidents were only taxed on in-state income).

In contrast with the unconstitutional taxes and fees the Supreme Court has struck down under the Privileges and Immunities Clause because the resulting disparate treatment was unrelated to the state's relationship with the activity in question, the SNRT is imposed solely on income earned in Maryland and thus is tied to the nonresident's relationship with the State. Moreover, the SNRT is tailored to serve the State's particular purpose, to obtain from nonresidents funding for local government services without imposing a rate that is higher or calculated differently from that imposed on residents for the same services.

██ The Privileges and Immunities Clause does not require "[p]erfect equality." *Travellers' Ins.*, 185 U.S. at 372, 22 S.Ct. 673 ("[P]erfect uniformity of taxation as regards to individuals or corporations ... is a dream unrealized." (quoting *State R.R. Tax Cases*, 92 U.S. 575, 612, 23 L.Ed. 663 (1876))). In light of this principle, we would be remiss to attempt to substitute our judgment for that of the General Assembly by suggesting that the substantial equality achieved through this tax scheme should have been more perfect. *See id.* ("[T]he most complete system which can be devised must, when we consider the immense variety of subjects which it necessarily embraces, be imperfect. And when we come to its application ... the application being made by men whose judgments and opinions must vary as they are affected by all the circumstances brought to bear upon each individual, the result must inevitably partake largely of the imperfection of human nature and of the evidence on which human judgment is founded." (internal quotation mark omitted) (quoting *State R.R. Cases*, 92 U.S. at 612)). Maryland's tax scheme does not impose a higher income tax on nonresidents and, instead, treats with substantial equality nonresidents and residents.

We turn now to Petitioners' argument that upholding the SNRT will result in an onslaught of similar state taxes and thus provoke a "tax war" among the states. To support this contention, Petitioners direct us to *Austin*, in which the Supreme Court considered a challenge to a New Hampshire commuters tax that taxed at a 4% rate nonresident income earned in New Hampshire even though the state effectively did not tax the income of residents at all. 420 U.S. at 665–66, 95 S.Ct. 1191. The statute enacting the tax imposed a lesser rate if the taxpayer's income would have been subject to a lower rate if earned in her home state. *Id.* at 658, 95 S.Ct. 1191. Residents who earned income out-of-state, however, were exempt from the tax if that income was taxed in the state in which it was earned, exempt from taxation in the state where it was earned, or if the state in which it was earned imposed no income tax on nonresidents. *Id.* at 658, 95 S.Ct. 1191. The Court concluded that the tax violated the Privi-

leges and Immunities Clause because, under the tax, nonresidents and residents were not subject to substantially equivalent treatment. *Id.* at 665, 95 S.Ct. 1191. In so holding, the Court rejected New Hampshire's argument that the effect of the tax could be offset by a tax credit provided in the nonresidents' home state. The Court explained: "[W]e do not think the possibility that Maine could shield its residents from New Hampshire's tax cures the constitutional defect of the discrimination in that tax." *Id.* at 666–67, 95 S.Ct. 1191.

The *Austin* Court considered a similarly discriminatory tax scheme in *Travis* in which New York adopted an income tax applicable to residents and nonresidents and providing an exemption for nonresidents whose home states also imposed an income tax "only if the laws of said state or country grant a substantially similar credit to residents of this state subject to income tax under such laws." 252 U.S. at 74, 40 S.Ct. 228 (internal quotation mark omitted). In striking down the law, the Court dismissed the state's contention that the injustice worked upon nonresidents could "be avoided" if the surrounding states adopted income tax schemes "providing similar exemptions similarly conditioned." *Id.* at 82, 40 S.Ct. 228. Such a contention, the Court explained, was "wholly speculative" and inconsistent with the Court's obligation to consider the "statute with respect to its effect and operation in the existing situation." *Id.*

In these cases, the risk of a "tax war," such as Petitioners reference, was endemic to the tax scheme at issue: a scheme in which the equal treatment of nonresident and resident taxpayers is contingent on the type of tax scheme adopted in the nonresident's home state. *See Austin,* 420 U.S. at 667, 95 S.Ct. 1191 (describing the New Hampshire tax as inviting nonresident taxpayers "to induce their representatives, if they can, to retaliate against it"); *see also Travis,* 252 U.S. at 82, 40 S.Ct. 228 (explaining that one state's discrimination against nonresidents cannot be cured by the expectation that other states will adopt "like discriminations" against residents of that state). Petitioners' contention that other states will adopt retaliatory taxes in response to the SNRT assumes (1) that

the SNRT subjects nonresidents to inherently unequal treatment that will provoke neighboring states to subject Maryland residents to some similarly unequal treatment and (2) the existence in other states of tax schemes, similar to that in Maryland, in which nonresident taxpayers escape liability for the local services from which they benefit.

Petitioners' first assumption is unreasonable because whether nonresidents and residents are subjected to equal treatment under Maryland's tax scheme is unrelated to the relevant out-of-state tax schemes; equal treatment is achieved internally. If a person earns taxable income in Maryland, that person is subject to either the SNRT at a rate equal to the lowest available county income tax rate or the county income tax. The applicability of these taxes is contingent on neither the availability of exemptions in other states nor on the adoption of an income tax in other states. As such, the SNRT provides no incentive for neighboring states to amend their current tax schemes to discriminate against Maryland residents.

Petitioners' second assumption, that other states will retaliate against the SNRT by amending their tax schemes to include a similar tax, is also flawed. Given the distinctive nature of Maryland's tax scheme, which we have emphasized throughout this opinion, the enactment of similar, retaliatory, taxes in other states is unlikely. Neighboring states likely already collect taxes from nonresidents to fund local services through various other types of taxes consistent with the tax scheme in that state. If not, the adoption of such a tax, as long as the burden on nonresidents is no more onerous than that imposed on residents, is not inherently retaliatory and would not be inconsistent with the underpinnings of the Privileges and Immunities Clause. Thus, Petitioners' assertion that the SNRT will likely instigate a "tax war" among the states is unreasonable and, certainly, provides no basis upon which we should conclude that the SNRT violates the Privileges and Immunities Clause.

 In sum, we hold that the SNRT does not violate the Privileges and Immunities Clause of the United States Constitution.

## VI.

 We now consider whether the SNRT violates the Maryland Constitution and Article 24 of the Maryland Declaration of Rights. Even though Article 24 of the Maryland Declaration of Rights does not explicitly include an equal protection clause, the concept of equal protection is inherent in the article's text. *See Att'y Gen. v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 940–41 (1981) ("Although the Maryland Constitution contains no express equal protection clause, we deem it settled that this concept of equal treatment is embodied in the due process requirement of Article 24 of the Declaration of Rights.").[18] "It is, perhaps because this State has no express equal protection clause that Article 24 has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.' " *Waldron*, 289 Md. at 704–05, 426 A.2d at 941 (citations omitted) (quoting *Bureau of Mines v. George's Creek Coal & Land Co.*, 272 Md. 143, 156, 321 A.2d 748, 755 (1974)). Yet, our tendency to construe both provisions *in pari materia* does not signal that Article 24 "will *always* be interpreted or applied in the same manner as its federal counterpart." *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002); *see*

---

**18.** The equal protection mandate of Article 24 has generally been considered by this Court to prohibit unequal treatment among Maryland residents. *See generally Verzi v. Baltimore County*, 333 Md. 411, 420–23, 635 A.2d 967, 971–73 (1994) (describing various cases in which this Court has considered under Article 24 laws making geographical distinctions among residents and explaining that we are suspicious of laws "treating residents of one county or city differently from residents of the remainder of the State"). Because the Comptroller has not argued otherwise, for the purposes of this opinion only, we assume that the equal protection guarantees provided under Article 24 extend to Petitioners as nonresidents, thus providing them with standing to challenge the SNRT under that provision.

*also Waldron*, 289 Md. at 714, 426 A.2d at 946 (noting that "each provision is independent, and a violation of one is not necessarily a violation of the other"). "Furthermore, cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provision." *Dua*, 370 Md. at 621, 805 A.2d at 1071. Accordingly, even though we have already determined that the SNRT does not violate the Equal Protection Clause of the federal Constitution, we must address separately whether, under the applicable Maryland authorities, that tax violates the State's equal protection guarantee.

Just as under the Equal Protection Clause of the Fourteenth Amendment, Petitioners argue that the SNRT violates the equal protection mandated by Article 24 of the Declaration of Rights because the State has "no rational basis for the [tax's] discrimination against the non-residents." To this end, Petitioners assert that the SNRT is not related to the "goal of requiring out-of-state residents to pay for governmental services." The Comptroller responds that, for the same reasons the SNRT does not violate the federal Equal Protection Clause, the tax does not violate the State's concept of equal protection. The Comptroller argues that "residents and non-residents pay the same amount of tax on the same income, and they pay that tax to the same entity—the Comptroller—under identical definitions of income, deduction and exemption." The Comptroller further argues that the State's interest bears a substantial relationship to the State's goal of equalizing the tax burden between residents and nonresidents to fund local government services by collecting revenues from nonresidents at a rate no higher than that imposed on residents for the same purpose.

"[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Neifert*, 395 Md. at 506, 910 A.2d at 1112 (internal quotation mark omitted) (quoting *Md. Aggregates Ass'n v. State*, 337 Md. 658, 673, 655 A.2d 886, 893 (1995)). A State tax law "that neither proceeds along suspect lines nor infringes fundamental

constitutional rights" will pass constitutional muster in this
State "if there is any reasonably conceivable state of facts that
could provide a rational basis for the classification." *Id.*, 910
A.2d at 1112 (quoting *Md. Aggregates Ass'n,* 337 Md. at 673,
655 A.2d at 893).[19] Despite the deference accorded the State
under this standard, we will not "hesitate[ ] to carefully exam-
ine a statute and declare it invalid if we cannot discern a
rational basis for its enactment." *Frankel,* 361 Md. at 315,
761 A.2d at 333 (quoting *Verzi v. Baltimore County,* 333 Md.
411, 419, 635 A.2d 967, 971 (1994)). Therefore, to justify a law
challenged under the equal protection afforded by Article 24,
the State must show that the "classification rest[s] upon some
ground of difference having a fair and substantial relation to
the object of the legislation." *Id.* at 316, 761 A.2d at 333
(internal quotation marks omitted) (quoting *Verzi,* 333 Md. at
419, 635 A.2d at 971).

To support their contention that the SNRT violates this
State's equal protection doctrine, Petitioners rely heavily on
*Frankel v. Board of Regents.* In that case we considered
whether a University of Maryland Board of Regents' policy
providing that no student "have in-state tuition status if more
than one-half of the student's financial support comes from a
person or persons who live out-of-state" violated Article 24's
equal protection doctrine. *Id.* at 314, 761 A.2d at 332. The
Board argued that the policy was intended to provide lower
tuition to bona fide Maryland residents than to nonresidents
and that "whether one receives . . . primary monetary support

---

**19.** Classifications on the basis of race, alienage, or national origin are
suspect and subject to strict scrutiny. *Broadwater v. State,* 306 Md. 597,
603, 510 A.2d 583, 586 (1986) (citing *Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The
classification in this case is based on state citizenship and thus is not
suspect. "Fundamental rights are those 'explicitly or implicitly guaran-
teed' by the federal constitution." *Waldron,* 289 Md. at 706, 426 A.2d
at 942 (quoting *San Antonio Independent Sch. Dist. v. Rodriguez,* 411
U.S. 1, 33–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). Petitioners do not
argue that the right to equal tax treatment in Maryland is a fundamen-
tal right, and we have not recognized it as such. *See id.,* at 721, 426
A.2d at 950 (outlining the various rights that the Supreme Court has
recognized as "fundamental").

from persons inside of the State or from out-of-state is 'proba-
tive' of his or her permanent residence." *Id.* at 317, 761 A.2d
at 334. Assuming that the Board's objective to provide resi-
dents with lower tuition was legitimate, we struck down the
regulation on the ground that the absolute "preclusion of
resident status for any student whose primary source of
monetary support resides out-of-state has no 'fair and sub-
stantial relation to' " that objective. *Id.,* 761 A.2d at 334. We
reached this conclusion, in part, because the policy would have
the effect of denying the lower tuition benefit to bona fide
Maryland residents. We do not come to the same conclusion
in this case.

Unlike the Board's policy in *Frankel,* the SNRT could not
reasonably undermine the State's objective of equalizing the
tax burden between nonresidents and residents collected to
fund local government services. The SNRT imposes a tax on
nonresidents tied to the lowest county rate in an effort not to
impose a greater burden than that imposed on the resident
taxpayers subject to the lowest county rate. Yet, the SNRT
still serves to balance the cost of providing local governmental
services between nonresidents and residents. Although this
policy may not maximize potential revenues by imposing vary-
ing rates according to geographic designations that mirror
those indicated in the county income tax provision, the policy
ensures that the State collects some revenues to support the
local services from which nonresidents benefit. Before the
State adopted the SNRT, these revenues went uncollected and
nonresident taxpayers largely benefitted from local services
without paying for them. Thus, we cannot say the SNRT fails
to serve the State's purpose or is irrational.

We disagree with Petitioners' contention that this policy is
inconsistent with the State's purpose because the revenues
generated under the SNRT are allocated to the General Fund
and the revenues generated under the county income tax are
allocated to the local municipal subdivisions. As the Tax
Court recognized, "the General Fund of Maryland exists to
provide funding for the benefit of all Maryland counties and
Baltimore City ... through legislation and through the legis-

lative budgeting process." Even if the revenues generated under the SNRT could be more directly allocated to the counties and Baltimore City, that possibility does not render the State's policy irrational. Attempting such a legislative scheme would likely present many challenges and pitfalls and is not a result required under the equal protection doctrine of Article 24. To repeat, we are not charged with ensuring that the legislature has enacted the best piece of legislation, merely a rational one. *See Neifert,* 395 Md. at 506, 910 A.2d at 1112. The SNRT satisfies this requisite.

For similar reasons we hold that the classification made by the SNRT is fairly and substantially related to the State's purpose. Although we have explained our reasons for this holding under the Equal Protection Clause, we restate them here to demonstrate that the same reasoning applies even under precedent solely applicable within this State. The SNRT reasonably distinguishes between residents and nonresidents because residents are subject to a county income tax to fund the local services from which they benefit and nonresidents are subject to no such tax. The tax's distinction between residents and nonresidents is not "based solely on geography," but rather is a product of the State's tax scheme, which funds local services by imposing taxes according to a person's domicile. *Frankel,* 361 Md. at 316, 761 A.2d at 333 (quoting *Verzi,* 333 Md. at 423, 635 A.2d at 973). Without this tax, nonresidents fall outside the scope of that tax scheme and receive the benefits of local governmental services without paying their fair share. Furthermore, the SNRT does not single out nonresidents for disparate treatment because Maryland residents are subject to the county income tax, which is at least an equal, if not higher, burden.

Given that the effect of the SNRT is to equalize treatment between nonresidents and residents rather than to treat them differently, and that the classification apparent in the SNRT reasonably serves this purpose, we hold that the SNRT does not violate Article 24 of the Maryland Declaration of Rights. With this holding we have resolved the issues

presented by Petitioners and now consider the merits of the Comptroller's challenge to the Tax Court's authority to abate interest assessments.

## VII.

At this point it bears repeating that, when Petitioners appealed to the Tax Court, they asked the court to determine whether the interest assessed against them due to their failure to pay the SNRT should be abated for reasonable cause, pursuant to T.G. § 13–606. That statutory provision provides that "a tax collector" may, for reasonable cause, waive interest assessed against unpaid tax. T.G. § 13–606. The Tax Court, however, determined that it did not have the authority to abate that interest.

The Comptroller argues that the Tax Court has no authority to abate interest assessed against unpaid taxes because the Tax–General Article does not expressly vest the Tax Court with that authority. The Comptroller contends that such an exercise of authority without statutory guidance is tantamount to giving the Tax Court unfettered discretion regarding the imposition of interest and therefore to make policy-based decisions. The Comptroller contends that permitting the Tax Court to render such decisions not only invites "claims for abatement based on all manner of 'public policy' grounds" but also usurps power the General Assembly intended to grant solely to the Comptroller and other designated officials. The Comptroller further asserts that the Court of Special Appeals erred, in part, by grounding its decision in the determination that a contrary interpretation of the applicable statutes would "render parts of the statutory scheme a nullity." The Comptroller contends that this rationale ignores the statutory distinction between "tax collector" and Tax Court and, consequently, "violates the well established principle that defined terms in a statute have the specific meaning given by the Legislature, and that specific definitions prevail over general terms."

Petitioners respond that, as determined by the Court of Special Appeals, the Tax Court's authority to abate interest is evident in "[t]he plain language of T.G. § 13–510(a)(1) [, which] allows for an appeal to the Tax Court from 'a final assessment of tax, interest, or penalty[,]'.... T.G. § 3–103(a)(4)[, which] grants the Tax Court jurisdiction to hear appeals concerning 'the application for an abatement, reduction, or revision of any assessment or tax[,]'" and the Tax Court's power under T.G. § 13–528(a) to "reassess or reclassify, abate, modify, change or alter any valuation, assessment, classification, tax or final order appealed to the Tax Court." Petitioners further contend that the Tax Court's discretion to abate interest is not unlimited and, instead, that waiver of interest is permitted, per T.G. § 13–606, only for "reasonable cause."

 Our rules of statutory interpretation are well-settled. When construing a statute, our primary objective is to ascertain the legislature's intent as conveyed by the plain meaning of the text. *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186, 193 (2005). To accomplish this goal, we assign each word its "ordinary and natural meaning," *O'Connor v. Baltimore County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004), and we read the text "so that no word, clause, sentence or phrase is rendered superfluous or nugatory," *Chow v. State*, 393 Md. 431, 443, 903 A.2d 388, 395 (2006) (internal quotation mark omitted) (quoting *Kushell*, 385 Md. at 577, 870 A.2d at 193). Moreover, we do not interpret the relevant provisions in isolation. "Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Id.*, 903 A.2d at 395 (quoting *Kushell*, 385 Md. at 577, 870 A.2d at 193); *accord Smack v. Dep't of Health & Mental Hygiene*, 378 Md. 298, 304–05, 835 A.2d 1175, 1178–79 (2003) (requiring a statute be given a reasonable interpretation when there is no ambiguity in the language). Where there is no ambiguity and the words of a statute are clear, we "simply apply the statute as it reads." *Gillespie v. State*, 370 Md. 219, 222, 804 A.2d 426, 427 (2002); *accord Whiting–Turner Con-*

*tracting Co. v. Fitzpatrick,* 366 Md. 295, 301, 783 A.2d 667, 670 (2001) (acknowledging that, when a statute is unambiguous, the court's inquiry ends with the text).

■■■ T.G. § 13–601(a) mandates that the "tax collector shall assess interest on the unpaid tax from the due date to the date on which the tax is paid." T.G. § 13–606 provides, however, that, "[f]or reasonable cause, a tax collector may waive interest on unpaid tax." The Comptroller argues that, because these provisions explicitly vest in tax collectors the power to impose and waive interest assessments, that authority is strictly within the province of tax collectors, not the Tax Court.[20] Yet, nothing in the statutory scheme indicates that the General Assembly intended tax collectors to have sole authority over the waiver of interest. Furthermore, we need not and, if possible, shall not construe the tax collector's authority to assess and waive interest as mutually exclusive of the Tax Court's authority to consider appeals from such assessments. "[W]hen two provisions 'relate to the same subject matter, and are not inconsistent with each other, they should be construed together and harmonized where consistent with their general object and scope.'" *120 West Fayette Street, LLLP v. Baltimore,* 413 Md. 309, 331, 992 A.2d 459, 472–73 (2010) (quoting *Md.–Nat'l Capital Park & Planning Comm'n v. Anderson,* 395 Md. 172, 183, 909 A.2d 694, 700 (2006)). Examination of the statutory provisions establishing the Tax Court's jurisdiction and power of review demonstrates that the tax collector's authority to assess and waive interest is not wholly inconsistent with the Tax Court's authority to consider appeals from such assessments.

■■■ The Tax Court derives its authority from T.G. § 3–103(a), which provides, in relevant part:

(a) *In general.*—The Tax Court has jurisdiction to hear appeals from the final decision, final determination, or final

---

**20.** T.G. § 13–101(c) defines "tax collector" as "the person or governmental unit responsible for collecting a tax," including the Comptroller and the State Department of Assessments and Taxation.

order of a property tax assessment appeal board or any other unit of the State government or of a political subdivision of the State that is authorized to make the final decision or determination or issue the final order about any tax issue, including:

(1) the valuation, assessment, or classification of property;

(2) the imposition of a tax;

(3) the determination of a claim for refund;

(4) the application for an abatement, reduction, or revision of any assessment or tax; or

(5) the application for an exemption from any assessment or tax.

By its plain language, T.G. § 3–103(a) grants the Tax Court jurisdiction over any "final decision, final determination, or final order" of *"any* ... unit of State government or of a political subdivision of the State" authorized to make such a determination about *any* tax issue, including "the application for an abatement, reduction, or revision of *any* assessment or tax." (emphasis added). Thus, as long as a party seeks review from a final decision about *any tax issue* made by a person or entity to make such a decision, the Tax Court is authorized to consider that appeal.

 As to whether the assessment of interest constitutes *"any* tax issue," we need not speculate because T.G. § 13–510(a)(1) provides that a party may appeal to the Tax Court "a final assessment of tax, *interest,* or penalty under this article." (emphasis added). Moreover, T.G. § 13–528 establishes that, when considering appeals from the Comptroller's final assessment of interest, "the Tax Court shall have full power to hear, try, determine, or remand any matter before it," § 13–528(a)(1), and "[i]n exercising these powers, the Tax Court may reassess or reclassify, *abate,* modify, change or alter *any* valuation, assessment, classification, tax or final order appealed to the Tax Court," § 13–528(a)(2) (emphasis added). The plain language of these provisions is clear: a party subject to a final assessment of interest may appeal that assessment to

the Tax Court, and the Tax Court has the full power to hear that appeal and abate any assessment. T.G. §§ 13–510, 13–528(a)(1)–(a)(2). The General Assembly's use of the word "any" to modify "assessment" compels the conclusion that the Tax Court may abate interest assessments.[21] To construe these provisions otherwise would be "contrary to the plain language of a statute" and tantamount to "judicially insert[ing] language to impose exceptions, limitations or restrictions not set forth by the legislature," a practice strictly prohibited under our rules of statutory construction. *See O'Connor,* 382 Md. at 113, 854 A.2d at 1198 (internal quotation mark omitted) (quoting *Langston v. Langston,* 366 Md. 490, 515, 784 A.2d 1086, 1100 (2001)). Likewise, a construction that excludes interest assessments from the Tax Court's power of review would also render nugatory the language of T.G. § 13–510(a)(1) authorizing appeals from "a final assessment of . . . interest" and therefore would be contrary to our rules of construction. *See Chow,* 393 Md. at 443, 903 A.2d at 395.

We have determined that a party may appeal an assessment of interest to the Tax Court, but the issue of the proper standard of judicial review remains. The Comptroller argues that recognizing the Tax Court's authority to review the

---

**21.** Although somewhat tangential to this discussion, we note that during the proceedings precipitating this appeal, the Tax Court abated the penalties assessed against Petitioners for their failure to pay the SNRT. Yet, the Comptroller does not challenge the Tax Court's decision to abate the penalty assessments as exceeding the scope of the court's authority.

T.G. § 13–701(a) provides that "the tax collector shall assess a penalty" in the event that a party fails to pay a tax when due and T.G. § 13–714 provides that "[f]or reasonable cause, a tax collector may waive a penalty under this subtitle." These provisions are not materially distinguishable from T.G. § 13–601 and § 13–606, the provisions mandating the imposition and waiver of interest.

The Comptroller's failure to challenge the abatement of penalties undermines the argument that permitting the Tax Court to consider appeals related to the abatement of interest would be contrary to the statutes and vest the Tax Court with improper discretion. The propriety of the Tax Court's abatement of the penalties assessed against Petitioners is not before us in this appeal, however, and we neither approve nor disapprove of that action.

Comptroller's denial of requests to abate interest creates questions related to the appropriate standard of review. The Comptroller asserts that, if the Tax Court has the authority to make an independent determination of reasonable cause under T.G. § 13–606, the "Tax Court becomes a substitute collection arbitrator" and "a multitude of appeals" will ensue because the factors weighed in that determination are "constantly shifting." Additionally, the Comptroller argues that permitting this review subjects the tax collector's decision to assess or abate interest to judicial review and thus removes the decision-making process even further outside the system established by statute. The Comptroller suggests that review in the Tax Court must be limited to "the question of whether the Comptroller *as tax collector* exercised *his* discretion in a manner according to law." (emphasis in original). Thus, the Tax Court would serve in a capacity consistent with traditional notions of administrative review. In response, Petitioners argue that a discussion of the scope of the Tax Court's power of review is unnecessary because the T.G. §§ 13–606 and 13–714 establish reasonable cause as the standard of review. Petitioners further contend that, if the Comptroller seeks a different standard, only the General Assembly may grant that relief.

The Comptroller's concerns are unfounded. The statutory scheme establishes not only the procedures for appealing a final assessment to the Tax Court but also the substantive rules governing the Tax Court's review. Appeals to the Tax Court "shall be heard de novo and conducted in a manner similar to a proceeding in a court of general jurisdiction sitting without a jury." T.G. § 13–523. The party appealing an assessment, however, bears the burden of proving that the assessment was in error. *Fairchild Hiller Corp. v. Supervisor of Assessments,* 267 Md. 519, 523, 298 A.2d 148, 150 (1973). To do so, the party must provide "affirmative evidence in support of the relief being sought," or the Tax Court must find "an error apparent on the face of the proceeding from which the appeal is taken." T.G. § 13–528(b). In the absence of either of these conditions, "the decision, deter-

mination, or order from which the appeal is taken shall be affirmed." *Id.*

We have mentioned that T.G. § 13–606 provides that a tax collector may waive interest "for reasonable cause." Thus, keeping in mind the provisions governing appeals to the Tax Court, when the Tax Court considers appeals from a tax collector's refusal to abate an interest assessment, that court considers whether the party has demonstrated with affirmative evidence that reasonable cause exists or that the tax collector's decision was an obvious error. *See* T.G. § 13–528(b). Under this standard, a tax collector's assessment of interest will not be overturned unless the complaining party provides affirmative evidence demonstrating reasonable cause for the abatement or the tax collector has made an obvious error.

This standard of judicial review is deferential to the tax collector's discretion. Given, however, that the Tax Court did not consider whether Petitioners have shown reasonable cause for abatement, we need not elaborate further on this matter.

## VIII.

For the foregoing reasons, we hold that the SNRT does not violate the Commerce Clause, the Equal Protection Clause, or the Privileges and Immunities Clause of the United States Constitution. We further hold that the SNRT does not violate this State's equal protection doctrine as embodied in Article 24 of the Declaration of Rights of the Maryland Constitution. Additionally, we hold that the Tax Court's power of review extends to the abatement of interest assessments. Accordingly, we affirm the judgment of the Court of Special Appeals. We remand the case to that court with directions to remand the case to the Circuit Court for Anne Arundel County, which is to remand the case to the Tax Court to consider whether Petitioners are entitled to the abatement of interest.

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIR-**

CUIT COURT OF ANNE ARUNDEL COUNTY AND TO DIRECT THAT COURT TO REVERSE THE JUDGMENT OF THE TAX COURT TO THE EXTENT IT IS INCONSISTENT WITH THIS OPINION AND TO REMAND THE CASE TO THE TAX COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. FOUR-FIFTHS OF THE COST OF THIS APPEAL TO BE PAID IN EQUAL SHARES BY THE PETITIONERS/CROSS-RESPONDENTS AND ONE-FIFTH BY RESPONDENT/CROSS-PETITIONER.

BELL, C.J., and GREENE, J., Dissent.

BELL, C.J., dissenting, in which GREENE, J., joins.

I.

In this case, we are confronted with whether the county income tax[1] referenced in Maryland Code (1988, 2010 Repl. Vol.) § 10–106 of the Tax–General Article,[2] is, for constitution-

---

1. Also referred to as "local income tax."

2. Maryland Code (1988, 2010 Repl.Vol.) § 10–106 of the Tax–General Article provides:
 "County income tax rate."
 "(a) *In general; exception in Howard County.*—
 "(1) Each county shall set, by ordinance or resolution, a county income tax equal to at least 1% but not more than the percentage of an individual's Maryland taxable income as follows:
 "(i) 3.05% for a taxable year beginning after December 31, 1998 but before January 1, 2001;
 "(ii) 3.10% for a taxable year beginning after December 31, 2000 but before January 1, 2002; and
 "(iii) 3.20% for a taxable year beginning after December 31, 2001.
 "(2) A county income tax rate continues until the county changes the rate by ordinance or resolution.
 . "(3)(i) A county may not increase its county income tax rate above 2.6% until after the county has held a public hearing on the proposed act, ordinance, or resolution to increase the rate.
 (ii) The county shall publish at least once each week for 2 successive weeks in a newspaper or general circulation in the county:
 "1. notice of the public hearing; and
 "2. a fair summary of the proposed act, ordinance, or resolution to increase the county income tax rate above 2.6%.

al purposes,[3] a part of, or separate and distinct from, the State income tax structure.

The petitioners, partners at Saul Ewing LLP, a multi-state law firm, argue that it is the latter, rather than the former. None of the petitioners live [4] in the State of Maryland or work out of the firm's Baltimore City office; however, each partner, for the 2004 calendar year, was assessed Maryland State income taxes, which he or she was required to pay with respect to his or her allocable share of profit from the law firm. Pursuant to, and because of, Md.Code (1988, 2010 Repl.Vol.) § 10–106.1 of the Tax–General Article, which imposed a Special Non–Resident Tax ("SNRT"), in 2004, nonresident taxpayers were subject to additional Maryland taxes. The SNRT provision, provides:

"(4) Notwithstanding paragraph (1) or (2) of this subsection, in Howard County, the county income tax rate may be changed only by ordinance and not by resolution.
"(b) *Rate Change.*—If a county changes its county income tax rate, the county shall:
"(1) increase or decrease the rate in increments of one one-hundredth of a percentage point, effective on January 1 of the year that the county designates; and
"(2) give the Comptroller notice of the rate change and the effective date of the rate change on or before July 1 prior to its effective date."

3. This Court granted certiorari, *Frey v. Comptroller*, 409 Md. 46, 972 A.2d 861 (2009), to determine whether the Court of Special Appeals erred in determining that (1) although the Special Non–Resident Tax ("SNRT"), a tax imposed on non-residents earning income in the State of Maryland, was discriminatory on its face, it was, nonetheless, a valid compensatory tax under the Interstate Commerce Clause of the United States Constitution; (2) the SNRT does not violate the Equal Protection Clause of the United States Constitution; (3) the SNRT does not violate the Privileges and Immunities Clause of the United States Constitution; and (4) the SNRT does not violate the Maryland Constitution and the Declaration of Rights. The petitioners argue that the intermediate appellate court erred in concluding that the county income tax is a State income tax, and, thus, that it does not violate the compensatory doctrine by requiring nonresidents to pay a greater income tax than residents. They ask, therefore, this Court to determine whether the county income tax is, indeed, a State income tax and whether it is even relevant "to the constitutional issue."

4. Each of the petitioners resides in Pennsylvania.

"Individuals subject to State tax but not county tax."

"(a) *Tax imposed.*—An individual subject to the State income tax under § 10–105(a) of this subtitle, but not subject to the county income tax under § 10–106 of this subtitle, shall be subject to the tax imposed under this section.

"(b) *Rate.*—The rate of the tax imposed under this section shall be equal to the lowest county income tax rate set by any Maryland county in accordance with § 10–106 of this subtitle.

"(c) *Distribution.*—The tax imposed under this section shall be distributed by the Comptroller in accordance with § 2–609 of this article."

As a result, each petitioner was required to complete Form 505, Maryland Non–Resident Income Tax Return ("Form 505"). Consequently, in addition to the State income tax, because they are not residents of any one of the State's subdivisions, counties or Baltimore City, the petitioners were required to pay to the State the SNRT, the proceeds of which were distributed to the State's General Fund, at a maximum rate of 6%.

Residents of the State, on the other hand, paid Maryland State income taxes only at a maximum rate of 4.75%. To be sure, unlike non-residents, residents of the State pay, in addition to the State income tax, a local income tax of a minimum of 1.25% and a maximum of 3.20%;[5] however, the proceeds of the county income tax "are remitted to the counties that impose them." Consequently, without the SNRT, under the current county income tax scheme, non-residents earning income in the State do not pay local income taxes.

According to the petitioners, "non-residents were subjected to Maryland State income tax at a rate more than 25% higher than the rate imposed on residents." They reason that the

---

5. Although § 10–106(a) provides that "each county shall set, by ordinance, or resolution, a county income tax equal to at least 1%," the lowest rate currently in effect for a county tax is 1.25%, for Worcester County.

county income tax is not a part of the State income tax, and, therefore, the assessment of the SNRT is *"prima facie* unconstitutional under the Interstate Commerce Clause" and an invalid compensatory tax "under the three part test set forth by the Supreme Court in *Fulton Corp. v. Faulkner,* 516 U.S. 325, 331, 116 S.Ct. 848, 854, 133 L.Ed.2d 796, 805 (1996).[6] The Comptroller, on the other hand, argues that the SNRT "is a state-imposed substitute for the 'local' tax residents pay under State law," and, thus, is a "special method of state tax computation necessary to create equal tax treatment for residents and nonresidents." The Comptroller further elaborates:

"The tax imposed under § 10–106 is a State tax for comparative constitutional purposes because it is required by State law. *See* MD.CODE ANN., TAX–GEN. § 10–106(a) ('Each county shall set. . . .'). The State administers the tax on a single return, with a single payment of tax that is distributed by the State under State statutes. *See* MD.CODE ANN., TAX–GEN. §§ 2–101, 2–102, 2–104 (Comptroller administers income tax, which includes both State tax and local tax). The State

---

**6.** A facially discriminatory tax will "survive *Commerce Clause* scrutiny if it is a truly 'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce." *Fulton Corp. v. Faulkner,* 516 U.S. 325, 331, 116 S.Ct. 848, 854, 133 L.Ed.2d 796, 805 (1996). Three conditions must be met in order for the SNRT to be a "valid compensatory tax," as the United States Supreme Court has explained:

"Since *Silas Mason,* our cases have distilled three conditions necessary for a valid compensatory tax. First, 'a State must, as a threshold matter, identify . . . the [intrastate tax] burden for which the state is attempting to compensate.' *Oregon Waste [Sys., Inc. v. Dep't of Envtl. Quality of Ore.,* 511 U.S. 93, 103, 114 S.Ct. 1345, 1352, 128 L.Ed.2d 13, 23–24 (1994) ] (quoting *Maryland v. Louisiana,* 451 U.S. 725, 758, 101 S.Ct. 2114, 2135, 68 L.Ed.2d 576, 603 (1981)). Second, 'the tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce.' *Oregon Waste,* 511 U.S. at 103, [128 L.Ed.2d at 24, 114 S.Ct. at 1352.] 'Finally, the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive 'proxies' for each other.' *Ibid.* (quoting *Armco, Inc. v. Hardesty,* [467 U.S. 638, 643, 81 L.Ed.2d 540, 545, 104 S.Ct. 2620, 2623 (1984)) ]." *Fulton Corp. v. Faulkner,* 516 U.S. at 332–33, 116 S.Ct. at 854–55, 133 L.Ed.2d at 806.

sets the distribution of revenue. *See* MD.CODE ANN., TAX-GEN. § § 2–601 *et seq.* On the other side of the coin, the only power of local governments is to set the rate at or above the minimum required by State law. *See* MD.CODE ANN., TAX-GEN. § 10–106(a). For all these reasons, the resident's local tax payment under Tax–General Article § 10–106 is a State tax that is constitutionally comparable to the nonresident State tax of § 10–106.1."

The majority agrees with the Comptroller. It "conclude[s] that [this Court's] determination in *Stern* [*v. Comptroller of the Treasury*, 271 Md. 310, 316 A.2d 240 (1974)] that the county income tax is part of a State-administered income tax scheme was neither overruled nor undermined by this Court's holding in [*Comptroller of the Treasury v.*] *Blanton*, [390 Md. 528, 890 A.2d 279 (2006)] .... [and] for these same reasons, ... the county tax levied under T.G. § § 10–103 and 10–106 is a State tax." *Frey v. Comptroller of the Treas.*, Op. at 141–42, 29 A.3d at 492 (2011). The majority reasons:

"Petitioners' contention that the State and county income taxes are not part of a single State-imposed income tax scheme rests on the assumption that *Blanton* overruled our holding in *Stern* that the county income tax is a part of a State-administered income tax scheme. We do not interpret *Blanton* to have such an effect. Both *Stern* and *Blanton* were concerned primarily with the applicability of the out-of-state credit to the county tax, and in both cases, we resolved the issue by resorting to the rules of statutory construction. After our holding in *Stern*, the General Assembly amended the income tax provisions to provide explicitly that the out-of-state tax credit does not apply to county taxes. Our holding in *Blanton* was entirely contingent on the revision of the applicable statutory language and was silent as to the significance of the scheme through which the State and county taxes were administered."

"We may not infer from this silence the Court's intent to overrule the portion of *Stern* in which we concluded that the county tax was not administered by the local political subdi-

visions. Moreover, the administration of the county taxes has not materially changed since we reached that decision. The State continues to mandate the county taxes, regulate the authority to change their rates, collect them, and distribute the revenue back to the appropriate local political subdivision."

*Frey v. Comptroller of the Treas.*, Op. at 141, 29 A.3d at 492. I disagree. The county income tax and State income tax are not one and the same. Instead, as this Court ruled in *Blanton*, the State income tax is "separate and apart from ... [the] county income tax." 390 Md. at 541, 890 A.2d at 287.

## II.

In 1967, "Maryland's income tax law was completely restructured." *Stern v. Comptroller of the Treasury*, 271 Md. 310, 312, 316 A.2d 240, 241 (1974). The revision "incorporated the concept of a local tax for the first time." *Id.* In the 1967 Report of the Committee on Taxation and Fiscal Reform, which made the recommendations that were subsequently implemented by the General Assembly,[7] the need to give counties the authority to impose a local income tax was emphasized:

"III. The present temporary authority for local governments to impose taxes upon income or upon wages must be replaced by a permanent practical, and equitable local taxing authority.

"If local governments are to continue to carry their present share of responsibility for providing services and if property taxes are regressive in all cases and virtually exhausted in some cases, then local governments must be given other

7. The county income tax "came into law with passage of Chapter 142 of the Acts of 1967 implementing a report of the Committee on the Taxation and Fiscal Reform published on February 1, 1967." *See Coerper v. Comptroller of the Treasury*, 265 Md. 3, 5, 288 A.2d 187, 188 (1972).

sources through which they can tax the wealth of their citizens equitably."

*See* Report of the Committee on Taxation and Fiscal Reform: A Program to Meet Maryland's Fiscal Problems in 1968, 1 (Feb. 1, 1967). In its report to the Legislature, the Committee recommended that the temporary local taxing authority, in effect at that time, which gave the local subdivisions the power to impose a local tax on residents and nonresidents, be replaced with another local income tax that would give the counties and Baltimore City the "authority to levy a local income tax upon residents only." The report noted:

"When the tax reform bill failed to pass at the last regular Session of the General Assembly, a Special Session convening immediately afterward enacted a one year law authorizing the imposition of local taxes upon income of residents or upon earnings of both residents and nonresidents. Three counties have taken advantage of this authority to levy an income tax upon their residents. Baltimore City has imposed a tax upon earnings of residents and nonresidents."

It then recommended:

"that the present temporary taxing authority not be extended, and that it be replaced by an authority to levy a local income tax upon residents only. The tax is to be levied as a percentage of the State income tax to a maximum of 50 per cent. It is to be collected along with the State tax and returned to the subdivisions.[8]"

That was consistent with current practice and had implications for the State's role with regard to local taxes:

"It must be noted that the present State 3 per cent tax on ordinary income includes a rate of 0.68 per cent which is returned to local governments. Similarly, the 5 per cent tax

---

8. "Maryland's 23 counties and Baltimore City levy a local income tax which [it] collects on the state income tax return as a convenience for local governments." See Comptroller of Maryland Spotlight on Maryland Taxes (2011), http://individuals.marylandtaxes.com/incometax/localtax.asp.

on investment income includes a rate of 1.7 per cent which is returned. Thus, there is already a local tax upon income. *If the State is now to permit*[9] *a local levy as a percent of the State levy, it cannot logically administer a local tax within the State rate and another outside the State rate."* (emphasis added).

*Id.* at 8. At least one locality, under the temporary county income tax—Baltimore City—imposed the temporary local income tax on both its residents and non-residents.[10]

The county income tax provision, in its current form, is codified at § 10–103 of the Tax General Article and provides:

"County Income Tax."

"(a) *Required.* Each county shall have a county income tax on the Maryland taxable income of:

"(1) each resident, other than a fiduciary, who on the last day of the taxable year:

"(i) is domiciled in the county; or

"(ii) maintains a principal residence or a place of abode in the county;

---

**9.** The Maryland Constitution gives to the General Assembly, and only the General Assembly, the authority to determine the powers a county may exercise and the extent of these powers. Thus, a county may impose a local income tax upon its residents only if it first gets authorization from the General Assembly. *See* MD. CONST., Art. XI–A, § 2:

"General Assembly to provide grant of express powers; extension, modification, etc., of such powers."

"The General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, amended or repealed by the General Assembly." MD. CONST., Art. XI–A, § 2.

**10.** The Committee on Taxation and Fiscal Reform recommended, which the General Assembly adopted, that the counties and Baltimore city taxing authority be limited to imposing an income tax on residents, excluding nonresidents.

"(2) each personal representative of an estate if the decedent was domiciled in the county on the date of the decedent's death;

"(3) each resident fiduciary of:

"(i) a trust that is principally administered in the county; or

"(ii) a trust that is otherwise principally connected to the county and is not principally administered in the State; and

"(4) except as provided in § 10–806(c)[11] of this title, a nonresident who derives income from salary, wages, or other compensation for personal services for employment in the county.

"(b) *Limitation.* Except for the county income tax, a county, municipal corporation, special taxing district, or other political subdivision may not impose a general local income, earnings, or payroll tax, a general occupational license tax, or a general license or permit tax based on income, earnings, or gross receipts."

Prior to the instant case, this Court has rendered three decisions directly addressing the county income tax and its relationship with the State income tax—*Coerper v. Comptroller of the Treasury*, 265 Md. 3, 288 A.2d 187 (1972), *Stern v. Comptroller of the Treasury*, 271 Md. 310, 316 A.2d 240 (1974), and *Comptroller of the Treasury v. Blanton*, 390 Md. 528, 890 A.2d 279 (2006). In *Coerper v. Comptroller of the Treasury*, the petitioners, Mr. and Mrs. Coerper, were residents of

---

**11.** Section 10–806(c) provides:

*For county income tax purposes.*—For county income tax purposes, a nonresident who derives income from salary, wages, or other compensation for personal services for employment in a county shall file an income tax return, unless the Comptroller determines that each locality in which the nonresident resides:

"(1) imposes no tax on the income of a Maryland resident derived from wages for employment in that locality;

"(2). exempts that income from its tax on income; or

"(3) allows a credit for that income and exempts that income from the withholding requirements for its tax on income."

Montgomery County, 265 Md. at 4, 288 A.2d at 187, but Mr. Coerper, "a partner in a law firm which [had] its principal office in New York City," who worked in the firm's Washington D.C. office, was required to pay income taxes to the city of New York and the state of New York on "the partnership's income based on the percentage of the overall firm profits which [were] derived from the New York office." *Id.* Maryland Code (1988, 1969 Repl.Vol.) Article 81, § 290 provided a tax credit for in-state residents who were liable for income tax in another state. The provision then in effect provided:

"Whenever a resident individual of this State has become liable for income tax to another state upon such part of his net income for the taxable year as is properly subject to taxation in such state, the amount of income tax payable by him under this subtitle shall be reduced by the amount of the income tax so paid by him to such other state upon his producing to the Comptroller satisfactory evidence of the fact of such payment; but application of such credit shall not operate to reduce the tax payable under this subtitle to an amount less than would have been payable if the income subjected to tax in such other state were ignored. The credit provided for by this section shall not be granted to a taxpayer when the laws of such other state allow a credit to such taxpayer substantially similar to that granted by § 291 hereof."

Thus, the Coerpers, being subject to the New York local and state income taxes, were entitled to receive a credit in the State of Maryland where they resided. *Coerper*, 265 Md. at 5, 288 A.2d at 188.

The issue the Coerpers presented to this Court was "whether the local income tax [was] 'a percentage of the liability of such resident for State income tax' before or after application of the credit. . . ." *Id.* at 4, 288 A.2d at 187. We held "that the [local] tax [was] a percentage of the liability before application of the credit." *Id.* The Court reasoned, relying on and quoting, the February 1, 1967 Report of the Committee on Taxation and Fiscal Reform's discussion on the local income tax and its history:

"The relevant provisions of § 283 provide that the appropriate county authority 'shall adopt, by reference, a local income tax imposed upon the residents of any county or Baltimore City as a percentage of the liability of such resident for State income tax.' It further provide[d] that any tax so adopted shall be not less than 20% nor more than 50% of 'the State income tax liability of such resident.' This came into the law with the passage of Chapter 142 of the Acts of 1967 implementing a report of the Committee on Taxation and Fiscal Reform published on February 1, 1967. There had been earlier 'piggy back' income taxes in certain of the subdivisions. The committee report stated:

'It is recommended that the present temporary taxing authority not be extended, and that it be replaced by an authority to levy a local income tax upon residents only. The tax is to be levied as a percentage of the State income tax to a maximum of 50 per cent. It is to be collected along with the State tax and returned to the subdivisions.' "

*Id.* at 5, 288 A.2d at 188. The Court rejected the Coerpers' argument that the "county income tax should be computed [as] the amount due to the State after allowance of the § 290 credit for the tax paid New York," *id.* at 6, 288 A.2d at 188, explaining that the "Coerper[s'] position would have the possible absurd result of the Coerpers paying little or no local tax for the services provided by the county while a neighbor with similar income, exemptions, deductions might be paying a substantial local tax to support those services." *Id.* at 8, 288 A.2d at 189. It thus, accepted the Comptroller's argument that the Coerpers, by applying the local income tax liability before the credit, would be

"paying no more state income tax than any other taxpayer of the State of Maryland with like income, exemptions, and deductions, unless the tax imposed by the foreign state were greater than that which would be imposed in Maryland upon that amount of income. That would be one of the perils of having income in a foreign state. Likewise, Mr. and Mrs. Coerper would be paying exactly the same amount of local

income tax as a neighbor with like income, exemptions and deductions."

*Id.* at 7–8, 288 A.2d at 189.

The Court's opinion was silent on the question of whether the local income tax is, in fact, a part of the State tax. It may be inferred, and, therefore, argued, however, that this Court's acceptance of the rationale underlying its holding, that the local income tax liability of a taxpayer residing in "any county or Baltimore City" must be determined before "application of the credit," strongly support the conclusion that it believed that the local income tax and the State income tax are both separate and distinct. This is further buttressed by what the Court then stated:

"The key word here is 'credit.' The General Assembly granted a credit against the tax liability of a taxpayer. When it referred to state income tax liability it meant the amount of tax computed as due from a taxpayer on his income after allowance of the usual deductions and exemptions. *The fact that there might be credited against that tax liability losses arising from . . . sums paid other states for income taxes was not intended to reduce one whit the liability of the taxpayer or the sum payable by the taxpayer to the local subdivision.*" (emphasis added).

*Id.* at 9, 288 A.2d at 189.

In *Stern v. Comptroller of the Treasury,* the Court was asked to determine whether the petitioners, Mr. and Mrs. Stern, also residents of Montgomery County, were "entitled to claim a credit for income taxes paid another state . . . against that portion of their Maryland income tax which would be collected by the Comptroller and paid to the county where the Sterns reside[d]." 271 Md. at 311, 316 A.2d at 240. The local income tax provision, as amended, provided in part:

"The county council or board of county commissioners of any county and the mayor and city council of Baltimore, by ordinance or resolution enacted pursuant to their ordinary and regular legislative procedure, shall adopt, by referendum, a local income tax imposed upon the residents of any

county or Baltimore City as a percentage of the liability of such resident for State income tax. Any ordinance or resolution so enacted shall impose a rate of tax for any current calendar year and may provide that such tax rate shall continue in effect for each succeeding calendar year, unless and until such tax rate is changed or modified by a subsequent ordinance or resolution. Any income tax so adopted shall not be less than twenty (20) percent nor more than fifty (50) percent of the State income tax liability of such resident, and any such tax imposed, and any increase or decrease in any tax so imposed, shall be in increments of five (5) percent."

MD.CODE ANN. (1957, 1969 Repl.Vol., 1973 Cum.Supp.) Art. 81, § 283(a). When the Sterns filed their Maryland income tax returns "they took as a credit against both the State and local income tax the amount of income taxes paid the State of New York." *Stern*, 271 Md. at 312, 316 A.2d at 241. Finding that "[w]hen section 290 provide[d] that 'the amount of income tax payable by him under this subtitle shall be reduced by the amount of the income tax so paid by him to such other state', reference [was] clearly being made to taxes imposed by sections 279 through 323A of article 81, subtitled 'Income Tax,' this Court reasoned:

"While the argument that the tax is actually imposed by the ordinance or resolution adopted by the political subdivision is liminally attractive, its appeal is considerably attenuated by the provision of section 283(c) that 'Local income taxes imposed pursuant to this section shall be subject to the provisions of § 312 of this subtitle relating generally to withholding at the source, declaration of estimated tax due, and remittance thereof to the Comptroller.' Further, section 283(a) has provided since 1969 that the counties and Baltimore City *'shall adopt'*... local income taxes. There is no discretion in the subdivisions to adopt or refuse to adopt such a tax; the imposition of the tax is mandatory, and it is only with respect to the establishment of the rate of tax that the local governments retain a modicum of flexibility."

*Id.* at 313–14, 316 A.2d at 241–42. The Court in *Stern* held that the language, "income tax," found under § 290, included the county income tax, thus, the Stern's were entitled to apply the credit to both the State income and county income tax. *Id.* The Court in *Stern* found that, where "section 290 provide[d] that '*the amount of income tax payable by him under this subtitle* shall be reduced by the amount of the income tax so paid by him to such other state,'" the General Assembly, especially where it did not specify a particular income tax— either State income tax or county income tax—included all income tax as prescribed under the "Income Tax" subtitle. *Id.* at 313, 316 A.2d at 241.

In *Comptroller of the Treasury v. Blanton*, this Court addressed the issue, "whether a tax credit provided pursuant to Maryland Code (1998, 2004 Repl.Vol.), § 10–703(a) of the Tax–General Article, may be applied to both State and local income taxes paid by an individual." 390 Md. at 530, 890 A.2d at 281. The Circuit Court for Baltimore County found that it could, holding that "for the purposes of the tax credit in § 10–703(a),[12] 'State income tax' includes both State and local income taxes," *id.*, viewing the issue as one of statutory interpretation, *i.e.*, "whether the language of § 10–703(a) of the Tax–General Article allow[ed] for a credit solely toward the State income tax, or allow[ed] for a credit toward both State and local income taxes." *Id.* at 535, 890 A.2d at 283. This Court reversed. In reversing that decision, we held that " § 10–703(a) of the Tax–General Article [did] not reduce the amount owed by a Maryland resident for local income tax. The tax credit may be applied only to reduce the amount of an individual's state income tax liability." *Id.* at 531, 890 A.2d at 281.

---

12. Section 10–703(a) provides:

"*In general.*—Except as provided in subsection (b) of this section, a resident may claim a credit only against the State income tax for a taxable year in the amount determined under subsection (c) of this section for State or income paid to another state for the year."

In *Blanton*, the petitioners, Mr. and Mrs. Blanton, residents of Baltimore County, paid both Maryland and North Carolina income taxes. *Id.* It was not disputed that, pursuant to § 10–703(a), the Blantons were entitled to a credit for "taxes paid to North Carolina for North Carolina income tax." *Id.* at 532, 890 A.2d at 281. The Comptroller applied the credit to reduce only what the Blantons owed for State income tax, leaving their local income tax liability unchanged. *Id.* The Comptroller explained "that the Legislature intended a credit against the State income tax only," *id.*, as shown by the fact that the definition of "State" under the Code "excluded counties or local districts." *Id.* at 532–33, 890 A.2d at 282. He pointed out more particularly that § 1–101(u) defines "State" as "(1) a state, possession, territory, or commonwealth of the United States.[13]" *Id.* at 533, n. 6, 890 A.2d at 282, n. 6.

The Blantons, on the other hand, maintained that the State and local income taxes were not independent and should be calculated together. Indeed, they included with their State income taxes a letter "which challenged the layout of" the 2001 Form 502 Resident Maryland Tax Return, arguing that there was a "flaw in Form 502" because the "State and local income taxes [were] calculated independently of each other." *Id.* at 532, 890 A.2d at 282. They therefore, calculated both the State and local income tax jointly, rather than independently, and claiming the credit under § 10–703(a), "subtracted the North Carolina income tax amount" from the total of the two income taxes, which, according to the Blantons yielded the total of income tax owed. *Id.*

There, unlike in the case *sub judice*, the Comptroller argued that the State income tax and local income tax were independent, not one and the same, and that to hold otherwise was to "ignore[ ] the plain language of Maryland Code (1998, 2004

13. Section 1–101(f) defines "County" as "a county of the State and, unless expressly provided otherwise, Baltimore City." Section 10–101(n) of the Tax–General Article defines "State income tax" as "the state tax on income imposed under this subtitle." Section 10–101(d) defines "County income tax" as "the county tax on income authorized in § 10–103 of this subtitle."

Repl.Vol.), § § 10–101(d) and (n) of the Tax–General Article, which defined 'state income tax' and 'county income tax' separately.[14]" *Id.* at 535, n. 8, 890 A.2d at 284, n. 8. The Tax Court agreed; it "determined that the Legislature defined State tax and local tax as two distinct taxes, and, as such, they 'are not the same, they are two separate ideas.' " *Id.* at 533, 890 A.2d at 282. Thus, it affirmed the Comptroller's decision, holding "the Legislature intended for the credit to apply against the State income tax and not the local income tax." *Id.*

Both the Circuit Court and the Blantons contended "that the definition of 'State income tax' reverted back to the interpretation contained in *Stern v. Comptroller*, 271 Md. 310, 316 A.2d 240 (1974).' " *Blanton,* 390 Md. at 533, n. 7, 890 A.2d at 282, n. 7. In that case, this Court held that the language, "the amount of income tax payable by him under this subtitle," used in § 290 referred to State and local income tax, that the words "income tax" included all taxes found under the subtitle titled, "income," which included both the county income tax and State income tax. *Stern,* 271 Md. at 313, 316 A.2d at 241. We did not agree. Instead we held that § 10–703(a) "refer[red] only to the State income tax," *Blanton,* 390 Md. at 535, 890 A.2d at 283, and we further reached the conclusion that the State income tax is "separate and apart from ... [the] county income tax." *Id.* at 541, 890 A.2d at 287.

When reviewing the decision of an administrative agency "a degree of deference should often be accorded the position of the administrative agency." *Maryland Aviation Administration v. Noland,* 386 Md. 556, 571–72, 873 A.2d 1145, 1154–55 (2005). We have stated:

---

14. The Comptroller also argued that (1) the Legislature "only made non-substantive changes" when § 10–703(a) was revised in 1988; (2) "unless the Legislature denotes otherwise" recodification, modifications or enactments "ordinarily are non-substantive"; and (3) where § 10–703(a) provided that a taxpayer may "claim a credit only against the State income tax" explicitly meant that the local income tax was excluded. *Comptroller of the Treasury,* 390 Md. 528, 535, 890 A.2d 279, 283–284 (2006).

" '[A] court's task on review is *not* to substitute its judgment for the expertise of those persons who constitute the administrative agency, *United Parcel v. People's Counsel*, 336 Md. [569,] 576–577, 650 A.2d [226,] 230 [ (1990) ], quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. [505,] 513, 390 A.2d [1119,] 1124 [ (1978) ]. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. *Lussier v. Md. Racing Commission*, 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996), and cases there cited; *McCullough v. Wittner*, 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ('The interpretation of a statute by those officials charged with administering the statute is . . . entitled to weight.'). Furthermore, the expertise of the agency in its own field should be respected. *Fogle v. H & G Restaurant*, 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ v. Department of Natural Resources*, 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to administrative agencies will often include the authority to make 'significant discretionary policy determinations'); *Bd. of Ed. for Dorchester County v. Hubbard*, 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ('application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the' legal issues)."

*Maryland Aviation Administration v. Noland*, 386 Md. 556, 571–72, 873 A.2d 1145, 1154–55 (2005), quoting *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 68–69, 729 A.2d 376, 381 (1999) (footnote omitted).

The Tax Court, in the instant case, was correct when it determined that, in *Blanton*, this Court upheld "a Tax Court finding, [and made] it clear that the County income taxes are not just an element of the State income tax, but rather separate and distinct taxes." *Antzis v. Comptroller of the Treasury*, No. 05–IN–00–0486, 2006 WL 2129969, at *4, 2006 Md. Tax Ct. LEXIS *5, 11 (Jun. 22, 2006).

In holding that *Blanton* did not overrule *Stern* and that the "county income tax is a part of a State-administered income tax scheme," *Frey v. Comptroller of the Treas.*, Op. at 141, 29 A.3d at 492, and not one "administered by the local political subdivisions," *id.*, the majority ignores the history of the county tax, the caselaw that has developed as a result of the legislation, the reality of how the taxes work and interface. At the threshold, it must be remembered that a county lacks the authority to grant unto itself powers; they come only with the express authorization of the General Assembly. As we have seen, the General Assembly has given that express authorization to the counties and to Baltimore City; it has legislated their authority to levy a tax upon their residents. Although, undoubtedly, it could have done so, the Legislature did not retain the taxing authority and it did not characterize the tax as a State tax. Instead, it expressly gave the subdivisions the power to set the tax within certain perimeters and with notice to the State, to change the rates. It is telling, moreover, that, following the *Blanton* decision, the Legislature did not amend § 10–703 to make clear that the State income tax and the local income tax are one and the same, or, at least a part of the State's scheme.

Furthermore, and in any event, an interpretation that the county tax is a State tax, flies in the face of the history of the local income tax. If the county income tax, as the Comptroller argues and this Court holds, is, indeed, a State tax, implementing the county income tax was a superfluous act. The State income tax, prior to the 1967 revision, consisted of a State component and a local component. It included a percentage of the tax which was to be returned to the local governments. Consequently, prior to the authorization of the county income tax, the State levied on all residents a percentage which was "returned to local governments." Thus, the "State 3 per cent tax on ordinary income include[d] a rate of 0.68 per cent which [was] returned to local governments," in addition to "the 5 per cent tax on investment [which] include[d] a rate of 1.7 per cent which [was also] returned" to the counties. There was, as the Committee recommending

the local income tax acknowledged, "already a local tax upon income," which the State levied. In its recommendation to permit the counties and Baltimore City to levy taxes upon their residents, which the General Assembly adopted, the Committee emphasized that the State would no longer "administer a local tax:" "If the State is now to permit a local levy as a per cent of the State levy, it cannot logically administer a local tax within the State rate and another outside the State rate."

The majority further argues that the county income tax is a State tax because the State "collect[s]" the county income tax and "distribute[s] the revenue back to the appropriate local political subdivision." *Frey v. Comptroller of the Treas.*, Op. at 141, 29 A.3d at 492. Collecting taxes and distributing "the revenue back" to the counties do not result in rendering the county tax a State tax. The Comptroller concedes that collection of the county income tax is done merely as a "convenience" for the counties and Baltimore City: "Maryland's 23 counties and Baltimore City levy a local income tax which we collect on the state income tax return as a convenience for local governments." *See* Comptroller of Maryland Spotlight on Maryland Taxes (2011), http://individuals.marylandtaxes. com/incometax/localtax.asp. What is more important than who collects the local income tax is who levies the tax. It cannot be overlooked that it is the counties and Baltimore City, not the State, who set the rate for the local income tax. The county income tax is not a State tax, rather it is separate and distinct.

## III.

The Comptroller identifies the SNRT as a substitute for the local tax residents pay under State law; it follows, then, that the SNRT is also separate and distinct from a State tax, and is an additional burden imposed upon non-residents. The SNRT facially discriminates against interstate commerce by subjecting non-residents to Maryland State income taxes at a maximum rate of 6%, rather than the 4.75% maximum rate to which residents of the State are subject. The Supreme Court

has said that a State invoking the compensatory tax defense must identify the intrastate tax for which it seeks to compensate, *see Fulton,* 516 U.S. at 332, 116 S.Ct. at 854, 133 L.Ed.2d at 806, and it should go without saying that this intrastate tax must serve some purpose for which the State may legitimately impose a burden on interstate commerce.

In *Fulton,* petitioners were stockholders who brought suit against the North Carolina Secretary of Revenue ("Secretary"), challenging an "intangibles tax," which was a tax on the fair market value of corporate stock owned by North Carolina residents or people having a "business, commercial, or taxable situs" in the State. 516 U.S. at 327–28, 116 S.Ct. at 852, 133 L.Ed.2d at 802–804 (citing N.C. GEN.STAT. § 105–203 (1992)). Although the tax was assessed at a rate of one quarter of one percent, residents were entitled to a taxable percentage deduction equal to the fraction of the issuing corporation's income subject to tax in North Carolina, a figure set by a formula based on the portion of the issuing corporation's sales, payroll, and property located in the State. *Id.* at 328, 116 S.Ct. at 852, 133 L.Ed.2d at 803. "Thus, a corporation doing all of its business within the State would pay corporate income tax on 100% of its income, and the taxable percentage deduction allowed to resident owners of that corporation's stock under the intangibles tax would likewise be 100%. Stock in a corporation doing no business in North Carolina, on the other hand, would be taxable on 100% of its value." *Id.,* 116 S.Ct. at 852, 133 L.Ed.2d at 803–804.

The issue was whether the intangibles tax amounted to a valid "compensating tax" designed to place a burden on interstate commerce equal to what intrastate commerce already carried under the corporate income tax. *Id.* at 329, 116 S.Ct. at 853, 133 L.Ed.2d at 804. The Secretary contended that, because foreign corporations may avail themselves of access to North Carolina's capital markets, yet evade paying North Carolina's general corporate income tax to the extent of its business performed out-of-state, the State may impose a compensatory tax upon foreign corporations. *Id.* at 334–35, 116 S.Ct. at 855, 133 L.Ed.2d at 807. The Supreme Court rejected

this argument, relying primarily on its conclusion in *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Ore.*, 511 U.S. 93, 105, 114 S.Ct. 1345, 1353, 128 L.Ed.2d 13, 25 (1994), where it held that "Oregon could not charge an increased fee for disposal of waste generated out of state on the theory that in-state waste generators supported the cost of waste disposal facilities through general income taxes." *Fulton*, 516 U.S. at 335, 116 S.Ct. at 856, 133 L.Ed.2d at 807–808. The Supreme Court further opined, (internal citations omitted)

> "Although we relied primarily upon the conclusion that earning income and disposing of waste are not 'substantially equivalent taxable events,' we also spoke of the danger of treating general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine. 'Permitting discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation would allow a state to tax interstate commerce more heavily than in-state commerce *anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds.'* We declined then, as we do now, 'to open such an expansive loophole in our carefully confined compensatory tax jurisprudence.' "

*Id.* (Emphasis added).

In addition to not being persuaded that there existed an intrastate burden in the form of capital market maintenance, *id.* at 336, 116 S.Ct. at 856, 133 L.Ed.2d at 808, the Supreme Court held that the Secretary failed to meet both the second and third prongs of the analysis:

> "[T]he Secretary cannot tell us what proportion of the corporate income tax goes to support the capital market, or whether that proportion represents a burden greater than the one imposed on interstate commerce by the intangibles tax . . .
>
> "The tax, finally, fails even the third prong of compensatory tax analysis, which requires the compensating taxes to fall on substantially equivalent events . . . The Secretary fur-

ther contends that the intangibles tax and the corporate income tax fall on substantially equivalent 'events' because they fall on economically equivalent 'values': the value of a corporation's stock and the value of a corporation's income, respectively. Even assuming the truth of both these assertions, however, we find that the intangibles tax is not functionally equivalent to the corporate income tax."

*Id.* at 338–39, 116 S.Ct. at 857–59, 133 L.Ed.2d at 809–10.

Based on the precedent set by *Fulton*, the respondent in the instant case fails to meet the test for compensatory tax allowed under the Commerce Clause. First, there is no identifiable intrastate burden for which a local tax would compensate. None of the petitioners live in the State of Maryland or work out of the firm's Baltimore City office. Any benefits derived from the Saul Ewing, LLP branch location in Baltimore are merely attributable to the petitioners by way of the partnership and the profits derived therefrom, but not because there exists some instate activity or tangible benefit received on behalf of the petitioners. Similarly, in *Fulton*, the mere access to North Carolina's capital markets and, thus, the in-state profits derived therefrom and laws and services protecting those profits, were not valid intrastate burdens recognized by the Supreme Court. Rather, as we have seen, *id.* at 335, 116 S.Ct. at 856, 133 L.Ed.2d at 807–808, the Supreme Court expressly disallowed a discriminatory tax on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation.

To be sure, the petitioners do not dispute that Baltimore City provides a number of local services, i.e., police protection, fire protection, etc., to the law firm and, thus, to the employees who work there, and that such local benefits accrue indirectly to non-residents doing business in the jurisdiction. The record reflects, however, that the proceeds of the SNRT go into the State's General Fund. It cannot be said that the petitioners, by virtue of being partners in a firm operating at an office location in Baltimore City, are placing an additional burden on the State that is not already compensated for through the State income taxes they are required to pay.

Further, benefits "indirectly" imputed to non-residents who merely are taxed in the State would certainly fall under the "expansive loophole" the Supreme Court warned of, and sought to avoid.

Without meeting the first prong of the *Fulton* analysis, the respondent cannot meet the second and third prongs. Without showing an actual burden on intrastate commerce, the respondent cannot show that the tax on interstate commerce roughly approximates the value of that burden. And, finally, the Supreme Court has been reluctant to recognize equivalence arguments for pairing taxes upon earning of income with a number of privileges, including disposing of waste, *Oregon Waste*, 511 U.S. at 105, 114 S.Ct. at 1353, 128 L.Ed.2d at 25, the severance of natural resources from the soil and the use of resources imported from other States, *Maryland v. Louisiana*, 451 U.S. 725, 759, 101 S.Ct. 2114, 2135, 68 L.Ed.2d 576, 603 (1981), and the manufacturing and wholesaling of tangible goods, *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 244, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); *Armco, Inc. v. Hardesty*, 467 U.S. 638, 642, 104 S.Ct. 2620, 2622, 81 L.Ed.2d 540, 545 (1984). *Fulton*, 516 U.S. at 338–39, 116 S.Ct. at 857–59, 133 L.Ed.2d at 809–10. There is no equivalence between an additional State income tax and the access to profits and consumers of legal services in the State of Maryland.

The SNRT, as a tax separate from the general State income tax, is not a valid compensatory tax and thus does not survive Commerce Clause scrutiny.

I dissent.

Judge GREENE has authorized me to state that he joins this dissenting opinion.